The STANDARD OIL COMPANY

v.

AMERICAN CYANAMID COMPANY.

Civ. A. No. 80–1325.

United States District Court,
E.D. Louisiana.

April 10, 1984.

Robert E. Leake, Jr., Hammett, Leake, Hammett, New Orleans, La., for Standard Oil Co.; Rufus S. Day, Jr., Eben G. Crawford, Squire, Sanders & Dempsey, and John F. Jones, Cleveland, Ohio, of counsel.

Jon O. Nelson, D. Dennis Allegretti, Trial Attys., Jamie S. Smith, Allegretti, Newitt, Witcoff & McAndrews, Chicago, Ill., Harry B. Kelleher, Lemle, Kelleher, Kohlmeyer & Matthews, Joseph N. Mole, New Orleans, La., Margret Tribble, Wayne, N.J., for American Cyanamid Co.; Gordon L. Hart, Stamford, Conn., of counsel.

## OPINION

ARCENEAUX, District Judge.

The Standard Oil Company ("Sohio"), an Ohio Corporation with its principal place of business in Cleveland, Ohio, instituted this suit against American Cyanamid Company ("Cyanamid), a Maine corporation, but having its principal place of business in Wayne, New Jersey, on April 16, 1980. Cyanamid also does regular and substantial business in the Eastern District of Louisiana, including the operation of a large chemical plant at Fortier, Louisiana.

Sohio originally sought both injunctive relief and damages from Cyanamid based on the defendant's alleged infringement of Sohio's United States Patent No. 3,381,034, ("the original patent") and claim 2 of its U.S. Patent Number Reissue 28,525 ("the

reissue patent"). Prior to trial, Sohio withdrew its claims for injunctive relief and for infringement of the original patent. It maintained its claim for infringement of Claim 2 of the reissue patent, but limited its claim for damages on that claim to a reasonable royalty for the use of the invention from August 19, 1975, the date the U.S. Patent and Trademark office issued the reissue patent. Sohio also seeks its costs and attorneys fees in prosecuting this action.

Cyanamid has denied any infringement, and has counterclaimed for a declaration that the reissue patent in its entirety is invalid, unenforceable and not infringed. Cyanamid likewise seeks costs and attorneys fees.

Jurisdiction is in this court pursuant to 28 U.S.C. § 1338(a); venue lies under 28 U.S.C. § 1400(b).

## I. Background

This matter deals with a process used by Cyanamid to manufacture an organic chemical compound known as acrylamide, a valuable "starting material" for the production of polymers, which presently have varied uses in numerous applications. Acrylamide is produced by a chemical process from an organic compound known as acrylonitrile. Prior to the mid 1960's, this conversion was accomplished by the use of a two-step process using sulfuric acid.

In early 1965, Sohio instructed one of its research chemists, Dr. Janice L. Greene to investigate, among other things, the possibility of utilizing a catalytic method to accomplish such conversion. A catalyst is a material which will effect a chemical reaction without the catalyst itself being consumed in the reaction. The process is known as catalysis.

During the course of this investigation, Dr. Greene found that certain copper compounds would produce a catalytic result and would thereby convert acrylonitrile to acrylamide.

In June, 1965, Dr. Greene, and her colleague, Murrell Godfrey, applied for a patent on their work. In July, 1965, they assigned their rights in their work and in the patent application to Sohio. Patent counsel for Sohio, principally one John Jones, prepared and prosecuted the patent application.

By patent office action taken in mid-July, 1967, the examiner rejected the original claims, on two grounds:

First, he pointed out that the language of those claims "includes ions which are insoluble in the nitrile and $H_2O$," whereas the specification provided that the copper had to be *at least slightly soluble* in water, the nitrile, or both water and the nitrile." In response, Sohio amended the claims to include the "at least partially soluble" limitation now found in Claim 2. In so doing, Sohio remarked that "The claims all recite the ... solubility characteristics of the copper ion ..." This new limitation was accepted by the examiner.

Second, the examiner rejected use of the term "copper ion" on the ground that it was "broad, vague, indefinite and a distortion." In response to this rejection, Sohio amended the claims to include the limitation, "said copper ion being composed of copper in a combined valence state of $Cu^\circ + Cu^I$, $Cu^\circ + Cu^{II}$, $Cu^I + Cu^{II}$, or $Cu^\circ + Cu^I + Cu^{II}$." This limitation was also accepted by the examiner.

On April 30, 1968, U.S. Patent No. 3,381,034 entitled "Process for Hydrolyzing Nitriles" issued to Sohio.

In March or April, 1967, Dr. Greene, while investigating another process, came upon a literature reference to an article by a Dr. Kenichi Watanabe, published in 1964, entitled, "Studies on Organic Catalytic Reactions. II. The Hydration of Nitriles to Amides with Nickel Catalysts", 37 *Bull. Chem. Soc'y Japan*, 1325 (1964). ("The Watnabe Article"). She ordered a copy of the article, which was received by the Sohio research laboratory in April 1967, read by Dr. Greene and filed away. She did not call the article to the attention of patent counsel. The Watanabe article reports a catalytic conversion of benzonitrile to ben-

zamide using a substance known as Urishi-bara copper.

However, some six years later, in September of 1973, Attorney Jones learned of the Watanabe article while reading The Dow Chemical Company patent No. 3,758,578, which was issued on September 11, 1973, and in the fall of that year, he discussed the 1964 Watanabe article with Dr. Greene, who affirmed that she had not seen or found the article prior to applying for the original patent.

As a result of Jones' discovering the Watanabe article, Sohio filed an application to reissue the original Greene patent on April 26, 1974.

The "Reissue Application Oath by Assignee" states that:

"Donald G. Stevens, being duly sworn, deposes and says he is a citizen of the United States; that he is an authorized agent with signatory authority for The Standard Oil Company, an Ohio corporation, having a place of business at Midland Building, Cleveland, Ohio 44115; that the entire title of United States Letters Patent No. 3,381,034 for "Process for Hydrolyzing Nitriles", issued April 30, 1968, to Janice L. Greene and Murrel Godfrey, is vested in the said 'The Standard Oil Company'; that he verily believes the said Janice L. Greene and Murrel Godfrey to be the original and first inventors of the invention described and claimed in the aforesaid Letters Patent and in the foregoing specification; that he does not know and does not believe that said invention was ever known or used before the invention thereof by the said Janice L. Greene and Murrel Godfrey; that he verily believes the original United States Letters Patent No. 3,381,034 is partially inoperative by reason of patentee claiming more than it was entitled to in claims 1, 2 and 12 of said patent; that the patentees' attorney inadvertently, and without deceptive intent, erroneously included 'benzonitrile' in the group of compounds called 'nitriles'." [Plaintiff's Exhibit No. 4].

The specifications and claims of the reissue application worked significant changes in the terms of the original patent; that patent had claimed copper-ion based catalysis to amides of *two* classes of nitriles, known as aromatic nitriles and aliphatic nitriles. These compounds are distinguished on the basis of the arrangement of their constitutent carbon atoms. Two such compounds are relevant to this discussion —acrylonitrile, which is an aliphatic nitrile, and benzonitrile, which is an aromatic nitrile. The original Greene patent had claimed its catalysis process, using copper ions as a catalyst to produce amides, as to both aliphatic and aromatic nitriles.

The affidavit of Attorney Jones, accompanying the reissue application, states:

"John F. Jones, being duly sworn, deposes and says that he is a registered patent attorney, Registration No. 19,429; that as associate attorney he handled the prosecution of U.S. patent application Serial No. 468,546 which issued as U.S. Patent No. 3,381,034 for 'Process for Hydrolyzing Nitriles', to Janice L. Greene and Murrel Godfrey; that in the prosecution of said application the applicants believe they claimed more than they had a right to claim in the patent in regard to the recitation of one specific nitrile, namely, benzonitrile, as being part of their invention; that the hydrolysis of benzonitrile to benzamide is disclosed in *Bull. Chem. Soc. Japan*, 37, 1325 (1964) which was published prior to the filing of applicants' application Serial No. 468,546, but that this publication did not come to applicants' attention until some time after U.S. Patent No. 3,381,034 issued; that error of claiming the hydrolysis of benzonitrile to benzamide by applicants' process was made purely by accident and mistake by applicants' attorney with no intent to deceive on his part." [Plaintiff's Exhibit No. 4].

The specification and claims of the reissue application were identical to the original Greene patent except that Sohio sought to delete all reference to aromatic nitriles, in general, and to benzonitrile and its con-

version to benzamide, specifically; it also deleted Claim 1 which referred, *inter alia*, to aromatic nitriles generally, thus including benzonitrile; deleted benzonitrile from the group of nitriles specified by Claim 2; and deleted Claim 12 which was directed specifically to benzonitrile. [Stip. ¶ 30; Plaintiff's Exhibit No. 4].

In the first office action, the Patent Office Examiner rejected all of the claims of the reissue application, stating:

"Claims 2–11, 13 and 14 are rejected as being obvious under 35 U.S.C. 103 over Wantanabe, who disclose use of the copper catalyst to hydrate the nitrile to the amide in the presence of water. While Watanabe discloses the hydration of the aliphatic nitriles to be more difficult, there is no disclosure that the reaction is inoperative. Therefore, the Wantanabe teaching is enabling for a useful purpose, i.e. hydration of the aliphatic nitrile using the copper catalyst. *Kistler v. Weber*, 162 U.S.P.Q. 214. No reason or authority is presented which convinces the examiner that the reaction would not be expected to take place, or that the aliphatic nitriles would not hydrate to form the amides. *In re Farkas*, 151 1 U.S.P.Q. 109 [152 U.S.P.Q. 109, 368 F.2d 1016]." [Plaintiff's Exhibit No. 4].

Sohio (John Jones) responded as follows:

"This is in response to an Office Action mailed September 24, 1976."

"The rejection of the claims under 35 U.S.C. § 103 as being obvious over Watanabe is respectfully traversed."

"The personal interview granted to applicants' attorney by the Examiner, Mr. Moatz, is acknowledged. During the interview, applicants' attorney emphasized that the only nitrile shown in the experimental part of the Wantanabe article to be hydrolyzed to amides with copper-containing catalysts is benzonitrile. The applicants point out that 'Urishibara copper' is in fact metallic copper which is outside their claims. The Examiner asked that this be verified by submission of a literature reference. Applicants, in this reissue application, are attempting

to remove any stigma of reading on the prior art from the claims of their U.S. Patent No. 3,381,034. The applicants believe that the Watanabe reference is really not pertinent because, for the most part, it discloses catalysts which are known as 'Urishibara' catalysts. These materials are in fact metals in finely divided form. See in this regard the attached copies of pages 55 and 56 from the textbook *New Hydrogenating Catalysts* (1971) and Example 23 of the attached copy of U.S. Patent No. 3,767,706. Thus, the metallic copper Urishibara catalysts described in Watanabe are specifically disclaimed by applicants (page 3, line 10–11)." [Plaintiff's Exhibit No. 4].

The examiner subsequently withdrew his rejection and allowed all of the claims of the reissue patent application. The patent was reissued on August 19, 1975 as U.S. Patent No. Reissue 28,525; its Claim 2, the claim at issue in this case, is identical to Claim 2 of the original patent, save and except for the deletion of benzonitrile from the group of nitriles specified in the original claim.

Claim 2 of the reissue patent—the patent in suit—reads as follows:

The process for hydrolyzing a nitrile selected from the group consisting of acetonitrile, propionitrile, butyronitrile, acrylonitrile, methacrylonitrile, crotononitrile, maleic dinitrile, glutaronitrile, succinonitrile, adiponitrile, and cyclobutane-1,2-dicyanide [and benzonitrile] comprising contacting said nitrile with water at a pH of from about 1 to about 12.5 in the presence a copper ion, said copper ion being at least partially soluble in water, the nitrile or in both water and nitrile and said copper ion being composed of copper in a combined valence state of $Cu^{\circ} + Cu^{I}$, $Cu^{\circ} + Cu^{II}$, $Cu^{I} + Cu^{II}$, or $Cu^{\circ} + Cu^{I} + Cu^{II}$ at a temperature of from about 25°C to about 220°C at from about atmospheric pressure up to above 2000 psig. [Plaintiff's Exhibit No. 3].

## II. Cyanamid's Process

As noted above, in 1968 Cyanamid was utilizing the sulfuric acid process to pro-

duce acrylamide, but was plagued with the problems inherent in the process itself— i.e., a low yield of the product, and a high yield of by-products. Accordingly, Cyanamid began to search for "a better way". After examining a number of alternatives, Cynamid determined to use what it describes as a "metallic copper catalyst" to catalyze acrylonitrile into acrylamide, and in 1972 began construction of its Fortier, Louisiana plant for that purpose. It went on line in 1973. The process used in that plant involves the reaction of acrylonitrile with water in the presence of a copper catalyst to produce a high yield of acrylamide with few by products. Indeed, the acrylamide so produced is some 99.6% pure, and the yield of acrylamide from acrylonitrile is on the order of 90%.

Cyanamid asserts that the catalyst used in its process is essentially metallic copper, achieved by passing hydrogen gas over pellets composed of copper compounds, thus reducing such compounds to pure, metallic copper.[1]

Cyanamid's witnesses testified that once the hydrogen reduction process is complete, rigorous steps are followed to insure that no copper ions are introduced into the process, thus maintaining the copper catalyst in its reduced state of solid, insoluble, metallic copper. However tests of the reactor effluent show that it contains minute quantities of soluble copper ions, on the order of 2 parts per million.

*III—Cyanamid's Defense*

Cyanamid maintains that the process in use at the Fortier plant does not infringe Claim 2 of the reissue patent because (1) its process does not involve "hydrolyzing" acrylonitrile, (2) the catalyst it uses is cuprous or metallic copper, and therefore, by definition, is copper in a single valence state (i.e. $Cu°$) and (3) that its catalyst is "not at least partially soluble in water, the nitrile or in both water and nitrile". The Court will deal with these in order.

*1. Hydrolysis or hydration?*

Cyanamid insists that its process involves the "selective hydration" of the nitrile, that is, that since it involves the reaction of acrylonitrile with water in the presence of a solid metallic copper catalyst of high surface area, it is a heterogeneous solid-surface catalysis, while the Sohio process is a homogeneous ions-in-solution catalytic process. The distinction sought to be made is more ethereal than real, particularly in the light of the testimony of Cyanamid's witnesses Jerome A. Berson and F. Albert Cotton that the Cyanamid process involves hydrolysis. [Tr. 891 (Berson), Tr. 818–819 (Cotton)]. The process used by Cyanamid requires the presence of water— although the precise role the water plays, in the complex and essentially unknown catalytic reaction which takes place, is uncertain. Suffice it to say that in this Court's perception, whether the process is termed hydration or hydrolysis, it can be classified as a hydrolysis.[2]

---

**1.** "Reduction" is a process by which the valence state of a compound is changed. In the case at hand, the valance state of copper contained in the compound is sought to be "reduced" from one of the "copper-plus" states to $Cu°$ "Reduction" is the converse of "oxidation", the latter term connoting an atom losing one or more electrons. Reduction may occur by an acceptance of one or more electrons by an atom or the removal of oxygen from a compound. Hydrogen reduction occurs by the hydrogen attracting one or more of the electrons shared by the relevant form of copper contained in the compound, thus "reducing" the copper to its metallic, or $Cu°$ state. The valence of a given atom is measured by the number of electrons that must be added to it or taken from it in order to convert it to its elemental state. Electrons are

negative charges. Copper generally carries a zero valence, if metallic, or elemental, copper, a plus-one valence, if cuprous copper $(Cu^1)$, or a plus-two valence, if cupric copper $(Cu^{11})$.

Metallic copper $(Cu°)$ has been variously described as "elemental copper", "pure copper", or $Cu°$; the Court finds that it does not exist, as such, in the "real world" [Tr. 792, 821 (Cotton)] and that it is, inherently, an "abstract concept" (Tr. 821).

**2.** Dr. Cotton found the use of the form "hydrolyze" was imprecise, but acknowledged that in the context presented the term was applied in the usual way, "not very precise" but "hydrolyzing would probably be interpreted in that way". Dr. Greene testified that "hydrolosis is sometimes called "hydration" and that the terms are frequently used synonymously by chemists.

## 2. Copper in a single valence state?

Cyanamid's process involves a painstaking procedure to reduce certain copper compounds to pure or metallic copper, and then using this substance to produce a catalytic result, as opposed to the teaching found in Claim 2 of the reissue patent that catalysis occurs in the presence of a copper ion "... said copper ion being composed of copper in a combined valence state of $Cu^\circ + Cu^{1}$, $Cu^\circ + Cu^{11}$, $Cu^{1} + Cu^{11}$ or $Cu^\circ + Cu^{1} + Cu^{11} ...$". The fact that miniscule traces of copper ions are found in the reactor effluent do not mitigate this finding. The copper catalyst involved is a solid, insoluble catalyst, comprised of metallic copper, as pure as industrial chemical methods are capable of producing. Certainly, its purity is essentially equivalent to that of Urishibara copper, whose use as a catalyst in the subject process was disclaimed by Sohio in the reissue proceedings.[3] Nor can the Court agree that Sohio's disclaimer of Urishibara copper as a catalyst was intended, or had the legal affect, of limiting that disclaimer to Urishibara copper alone. Attorney Jones' amendment received by the patent office on December 30, 1974 specifically states, in referring to the Wantanabe article, that "... Urishibara copper is in fact metallic copper which is outside their claims." [Plaintiff's Exhibit No. 4]. A fair reading of this language points inescapably to the conclusion that Sohio intended to disclaim what it perceived to be "metallic copper", and that Urishibara copper was simply a kind of such metallic copper. This conclusion is further fortified by the later statement in that same document that "... for the most part (the Watanabe reference) discloses catalysts which are known as 'Urishibara' catalysts. These materials are in fact metals in finely divided form". (Emphasis added).

Further support for this conclusion is found in the fact that Attorney Jones attached "in this regard" to his amendment a copy of The Dow Chemical Company patent No. 3,767,706, dated October 30, 1973, [Plaintiff's Exhibit No. 4] which disclosed a process for the "Hydration of Aliphatic Nitriles to Amides Using Copper Metal Catalysts" and a method of preparing the copper catalyst by reducing copper salts with hydrogen, (Examples 7–17) as well as a "copper catalyst prepared by the reduction of $CuCl_2$ with Zn". This latter method is described in that patent as one used to prepare "a Urishibara—A copper catalyst". The Court believes that the disclaimer was directed not solely to Urishibara copper, as such, but to all kinds of equivalent metallic copper, whether prepared by the Urishibara-designed zinc-coating process, or by a method which has the effect of reducing a copper compound to metallic copper by other means, such as hydrogen reduction.[4]

Sohio seeks to counter the effect of Cyanamid's defense in this regard by insisting that metallic copper will not catalyze acrylonitrile to acrylamide, as reflected in Sohio's declaration in the specifications of the reissue patent that "we have found that metallic copper when used alone is ineffective in this process". Thus, Sohio urges, since the Cyanamid process works, this fact alone shows that the reaction is copper ion induced. The Court disagrees. Indeed, Dow, in its discussion of "Background of the Invention", declares that the invention is distinguished over prior art (the "original patent") "because the catalysts of the invention contain catalytic copper metal" and discloses that "Aliphatic nitriles are converted to the corresponding amides by contacting the nitrile in the presence of water with a cupreous catalyst containing copper metal".[5]

---

3. "Urishibara copper" is elemental copper that has been prepared by the reduction of cupric salts with zinc dust. The Court's finding that Sohio's disclaimer of such material as a catalyst is more fully explained below.

4. Plaintiff's Exhibit No. 4 reflects the full record history of the patent in suit. Its pages are not separately numbered, but a close examination

of this "file wrapper" history helps clarify an otherwise murkey scenario.

5. The subject Dow patent is referred to solely in order to illuminate otherwise confusing allegations. The Court does not imply that the patent has, or does not have, independent meaning or effect and the references in no way should be deemed as imposing any implied "imprimateur"

Sohio's electrochemical tests, which used a kind of metallic-type copper known as "Raney copper", are similarly unpersuasive. Whether Raney copper is the equivalent of the hydrogen-reduced metallic copper catalyst used by Cyanamid is not clear. These tests, although carefully structured, show that conversion of the subject nitrile to amide indeed, took place, and in significant quantities, no matter how completely the metal was reduced.

### 3. "... partially soluble ..."

Claim 2 of the reissue patent specifies "... said copper ion be(ing) at least partially soluble in water, the nitrile or in both water and nitrile ...".

The term "partially soluble" is not defined in the patent, nor was a standard definition of that term offered by Sohio. However, the term "slightly soluble" did appear to have an established meaning at the relevant time, that is, in the mid-1960's. W.H. Nebergall and F.C. Schmidt, *College Chemistry*, pp. 662–676; 764–765 (1957) [Plaintiff's Exhibit No. 29]; J.V. Quagliano, *Chemistry*, pp. 514–523 (1958) [Plaintiff's Exhibit No. 30]; L.H. Cragg and R.P. Graham, *Principles of Chemistry*, pp. 478–489 (1954) [Plaintiff's Exhibit No. 31].

■ The Court has found no textbook definition of the term "partially soluble", however, and Dr. Greene has admitted that the term "partially soluble" is not defined in the patent specifications. She should, of course, have done so in the patent, and if this had been done, that definition would have been binding on this court. *International Cork Co. v. New Process Cork Co.*, 6 F.2d 420, 422 (2d Cir.1925).

■ Sohio argues that "at least partially soluble" would have the same meaning as "at least slightly soluble". This Court disagrees. Taken alone, the expert testimony on this point is far from conclusive. However, when read against the language of the reissue patent, the testimony of Dr. Cotton [Tr. 794] and Dr. Ernest Yeager [Tr. 577] to the effect that "partially soluble" suggests "considerable amounts" and "substantial amounts", respectively, become more persuasive. To illustrate, the reissue patent specifications note that "... any cupic or cuprous salt may be used so long as it is at least *slightly soluble* ..." (Emphasis added). [Plaintiff's Exhibit No. 3, Col 2, l. 10–11], and that "... although CuCl, CuI, and CuCN are *practically insoluble* in water ... they can still catalyze the hydrolysis of nitriles to amides." [Plaintiff's Exhibit No. 3, Col 2 l. 13–15]. (Emphasis added). It is subsequently noted that:

> "The amount of catalyst appears to have little or no effect on the conversion of nitrile to hydrolysis products. At the lower catalyst levels, however, the reaction times required for significant hydrolysis may be quite long". [Plaintiff's Exhibit No. 3, Col 2, l. 34–39].

Obviously, Dr. Green, aware of the meaning of "slightly soluble", having used it in the specifications, and conceding that she was "skilled in the art" of chemistry at the time, Dr. Grene nevertheless elected to use another term, i.e. "partially soluble" when she stated Claim 2. Considering that she sought to devise a process useful in her employer's business, and having noted that "lower catalyst levels" required "quite long" reaction times [Plaintiff's Exhibit No. 3, the "reissue patent", Col. 2, lines 37–39] it can only be fairly concluded that she contemplated a process which required more than simply a "slightly soluble" ion; she required that the ion be "at least partially soluble".[6] Thus, in effect Dr. Greene defined in Claim 2 a significant and substantial degree of solubility.

---

thereon. The Court recognizes that Dow and Cyanamid occupy a litigious posture vis a vis one another in a matter pending in this Court. In no way should this references to, or comments concerning, the Dow patent be either construed or applied in any manner as having

any effect on that litigation or the respective rights of the parties involved.

6. Dr. Greene testified that the claim was designed and intended to cover what "we considered practical and useful."

The evidence is barren of any evidence to support the theory that Cyanamid's process trespasses upon that ground. As noted earlier, the effluent produced by the Cyanamid process contained only miniscule amounts of ionized copper; there is no indication that these resulted from its catalyst being partially soluble, or, in that matter, even slightly soluble. On the contrary, viewing this evidence in the light most favorable to Sohio's claims, the Court could at best find that the Cyanamid catalyst was perhaps "practically insoluble," using the patent specifications' reference to "Gmelin 60, *Handbuch der Anorganischer Chemie,*" pp. 406, 854. It is not necessary for the Court to do so, although the opportunity to assert that by no stretch of the imagination can "practically insoluble" be construed to mean "at least partially soluble" is tempting, indeed! Instead, the Court merely finds that the catalyst used by Cyanamid is not "at least partially soluble in water, the nitrile or in both water and nitrile."

In summary, in order to find an infringement as claimed by Sohio, the Court would be required to find that the Cyanamid process was one for:

1) Hydrolyzing acrylonitrile to acrylamide comprising contacting said nitrile with water at a pH of about 1 to 12.5;

2) In the presence of a copper ion ... said cooper ion being composed of copper in a combined valence state; and

3) Said copper ion being at least partially soluble in water, the nitrile or in both water and nitrile.

The Court finds that the Cyanamid process is one of hydrolysis.

The Court further finds that the catalyst used in the Cyanamid process is metallic copper, at least the equivalent of Urishibara copper, and that such copper metals were disclaimed by Sohio in its application for the reissue patent. A fair reading of Attorney Jones response to the patent examiner leaves doubt that this is precisely what happened. Having noted in its response that "... 'Urishibara copper' is in fact metallic copper which is outside [So-

hio's] claims", it is unrealistic and fundamentally unfair for Sohio to argue that if Urishibara copper should turn out to actually be multivalent copper, Claim 2 covers Urishibara copper. Copper metal, Urishibara copper, and its equivalents, are simply outside Claim 2 of the reissue patent. At the very least, Sohio is estopped by virtue of its reissue patent representations, made in order to overcome a rejection based on prior art (the "Watanabe article"), to obtain the claim construction it seeks. *Coleco Industries, Inc. v. U.S. International Trade Commission,* 573 F.2d 1247, 1257 (C.C.P.A.1978).

The Court additionally finds that even should the Cyanamid process be deemed one involving the use of copper ion, the copper ion is not "at least partially soluble in water, the nitrile or in both water and nitrile."

There is no infringement.

## IV.  Invalidity of the Reissue Patent

Defendant urges that the reissue patent is invalid because the invention:

A.  Violates the requirements of 35 U.S.C. § 112, first paragraph;

B.  Contravenes the provisions of 35 U.S.C. § 112, second paragraph;

C.  Was anticipated by prior art, and is therefore not patentable under the prohibitions contained in 35 U.S.C. § 102(b);

D.  Is "obvious" and therefore is not patentable under 35 U.S.C. § 103

A.  35 U.S.C. § 112, first paragraph, specifies:

"The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention."

Cyanamid's initial thrust is that the invention Sohio now seeks to protect is not

the invention taught in the reissue patent. Having found, for reasons previously stated, that Cyanamid's process does not infringe the terms of the reissue patent, the Court regards this claim as academic at this point. The processes are simply not the same.

Defendant's second attack on this front is leveled at the alleged lack of clarity, and indefiniteness, inherent in the reissue patent.

■ The Court is not impressed with the concept that the patent's reference to Cu° as a "copper ion" renders the subject claim indefinite. A patentee may define the terms he uses. *Ellipse Corp. v. Ford Motor Co.*, 452 F.2d 163, 167 (7th Cir.1971), *cert. denied*, 406 U.S. 948, 92 S.Ct. 2041, 32 L.Ed.2d 337 (1972). An inventor may be his own lexicographer. *Chicago Steel Foundry Co. v. Burnside Steel Foundry Co.*, 132 F.2d 812, 814 (7th Cir.1943). Dr. Greene has satisfied this requirement with reference to the subject "copper ion". The term is defined in the claim of the patent as well as in the specifications, the only possible fault being her reference to a Cu° as an "ion" when she obviously intended to refer to metallic copper.[7] While Dr. Greene might find trouble in the light of Dr. Cotton's grading system, [Tr. 821] the context in which the reference to metallic copper is made more than amply satisfies any purely theoretical difficulty.

■ The term "partially soluble" is another matter, however. As the Court has previously noted, there is obvious "waffling" as to the meaning of this term within the reissue patent itself since the subject catalyst is variously described "partially soluble", "slightly soluble" or "practically insoluble". Sohio seeks to cure this problem by asserting that all three of the terms are synonymous. As indicated earlier, this is an essentially specious argument. Two

of the terms—"slightly soluble" and "practically insoluble"—the Court believes, have relatively well established meanings. They are used in the cited literature to connote totally different degrees of solubility. The Court, as stated earlier, finds no generally accepted or textbook use of the term "partially soluble". Claiming that such diverse meaning terms as the three referred to are bound to mean, and were used to mean, the same thing presents an inherent ambiguity.

As previously indicated, Dr. Greene may have well intended, and the Court has found that she did intend, to use the term "partially soluble" as connoting a "substantial" degree of solubility. This finding was sufficient in dealing with the claim of infringement.

However, in dealing with the terms of the patent itself, such finding will not suffice. Instead, the Court must now determine if the term "partially soluble" as used in Claim 2 is sufficiently precise to meet the "full, clear, concise, and exact" requisites of 35 U.S.C. § 112.

The Court finds that it does not. There is no realistic way that "those skilled in the art" could utilize the process as claimed in the patent.

B. The same rationale is applicable to 35 U.S.C. § 112, second paragraph. The subject paragraph reads as follows:

"The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention".

At the risk of repetition, the Court emphasizes, again, that the term "partially soluble" is vague and indefinite with no established meaning perceptable to those skilled in the art at the relevant time. The testimony of expert witnesses is overwhelming on that point and is fully consistent with the referenced literature. Dr.

---

7. "Copper ion" was defined as an atom of copper lacking one electron (Cu[1]) or two electrons (Cu[1][1]), which exist in some physical situation. Dr. Cotton opined that in order to have ions, as normally construed in the field of aqueous chemistry, they would be surrounded by molecules of the solvent and free to move, or migrate, under the influence of an electric field. [Tr. 787] It also appears clear that metallic copper (Cu°) and ionized copper "are two different things". [Tr. 793]. Copper zero is not a copper ion. [Tr. 820].

Greene certainly had the right, and the skill and background, to have defined the term, if she had chosen to do so. Even a simple reference to a solubility factor would have sufficed. Having found that "partially soluble" as used in the claim differs significantly from either "slightly soluble" or "practically insoluble" as those terms are respectively used in the specifications and that they are not synonyms for the term "partially soluble" (or even, for that matter, one another), the Court further finds that "partially soluble" is too vague to particularly point out and distinctly claim the subject matter which Sohio claims as its invention. *In re Borkowski* 422 F.2d 904, 909 (C.C.P.A.1970). See also *In re Conley*, 490 F.2d 972, 975 (C.C.P.A.1974).

■ C. The third claim of invalidity is founded on 35 U.S.C. § 102(b), which in relevant part reads as follows:

"A person shall be entitled to a patent unless—

(b) the invention was patented or described in a printed publication in this or a foreign country of in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, ..."

In effect, this provision of law denies patent protection to an "invention" which is not new, or, in patent law jargon, if the invention was "anticipated by prior art".

The Court finds that the reissue patent is not anticipated by the prior art. In this regard, defendant relies, essentially, on U.S. patent No. 1,891,055 issued in December, 1932 to Walter Reppe et al. ("the Reppe patent"). Reppe was described by Cyanamid witness Dr. Cotton, as the "virtual Czar of German chemistry". [Tr. 812]

The Reppe patent [Plaintiff's Exhibit No. 53] described a process for the "Production of Saturated Fatty Acid Nitriles", and in Example 2, reflects a method for the production of a propionic nitrile (acrylonitrile) using hydrogen reduced copper carbonate as a catalyst, which process yields "91 percent of the theoretical yield of propionic nitrile and 2 percent of a propionic amide," that is, in the example used, acrylomide.

[Plaintiff's Exhibit No. 53, Col. 2, 1. 109–111]. On its face, as indicated by Dr. Good in response to, essentially, a hypothetical question by counsel for Cyanamid [Tr. 651–652] and confirmed by Cyanamid witness Dr. Cotton [Tr. 814–815], the described process would "infringe" Claim 2 of the reissue patent. But the Court believes the bases for these questions were essentially incomplete. Unstated was a prior step reflected in Example 2, namely, the manner in which the "crude 92 percent acrylic nitrile" subjected to the catalytic process was made—that is, by dehydrating ethylene cyanhydrin by passing it over bauxite, thus producing 92 percent pure acrylonitrile plus 8 percent of an unknown substance. [Plaintiff's Exhibit No. 53, Col. 2, 1. 96–97]. It is this mixture which is subjected to the reduced copper carbonate catalyst, and which yields 91 percent of the theoretical yield of propionic nitrile and 2 percent propionic amide. The flaw in Cyanamid's logic is subsequently divulged by Dr. Cotton's testimony in response to counsel for Sohio:

Q. Now, Doctor, let me ask you this question: If I am sitting back in my laboratory in 1965, and I see Reppe, and I see that he gets a little bit of proprionic amide ...—how would I know whether the amide was created during step one of the procedure or step two of the procedure?

A. You would certainly not be entirely certain. [Tr. 836].

The Court observes initially that the reissue patent involves a catalytic process, and that such processes are extremely unpredictable. *In re Angstadt*, 537 F.2d 498, 502, (C.C.P.A.1976); *In re Mercier*, 515 F.2d 1161, 1168 (C.C.P.A.1975).

While the ultimate Reppe process as set forth in his patent's Example 2 appears, for all practical purposes, to be essentially identical to that claimed in the reissue patent, the Court observes that the material catalyzed (the acrylic nitrile) contained 8 percent of an unknown substance and that after the catalysis took place, even considering that the theoretical yield included

91 percent propionic nitrile and 2 percent propionic amide, Example 2 of Reppe leaves 7 percent unaccounted for. Without analysis of the composition of the 8 percent unknown substance included in the material catalyzed (and remembering that Reppe's purpose was to produce a saturated fatty nitrile), it is not unreasonable to assume that the amide could well have been included in it and produced by Step 1. Nothing in the example cited could, at best, have rendered the Greene invention anticipated by the Reppe patent.

D. Cyanamid additionally claims that the reissue patent was "obvious" under prior art, and relies upon, inter alia, the Reppe patent and pre-1965 publications, particularly the 1964 Watanabe Article, referred to above.

Cyanamid specifically claims that the patent is invalid under 35 U.S.C. § 103, which declares:

"A patent may not be obtained through the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

In 1959, Watanabe had published a preliminary note touching on this same subject where he reported that nitriles are hydrated to the corresponding amides by the catalytic action of nickel. 32 *Bull. Chem. Soc'y Japan* p. 1230 (1959) (The 1959 "Watanabe Article").

As noted earlier herein, Dr. Greene first learned about the 1964 Watanabe article in March or April, 1967, when she was investigating the dimerization of acrylonitrile, a process having nothing to do with the conversion of nitriles to amides. During the course of this investigation she and her assistant, Nancy Renkert, tried to use nickel to catalyze the dimerization reaction.

When they ran the experiment they found that a little acrylamide had been generated. This prompted Dr. Greene to do a literature search on the use of nickel as a catalyst for converting nitriles to amides. During this search, she found a reference to the 1964 Watanabe article in the *Chemical Abstracts* index. She noted the Watanabe article in an "Inventor's Preliminary Disclosure" she prepared with respect to her discovery that nickel would catalyze acrylonitrile to acrylamide, and ordered a copy of the article. It was received by Sohio's research laboratory on April 18, 1967. Dr. Greene read it and filed it away with her nickel work. She did not bring the article to the attention of Attorney Jones, the Sohio patent attorney who was then prosecuting the application leading to the patent suit through the Patent Office, because she did not think it was relevant to that application [Stip. ¶ 15; Plaintiff's Exhibit No. 33; Defendant's Exhibit No. 135, Tr. 227–228, 230–231, 244–245, 341–342.]

In September, 1973—more than six years after Dr. Greene had come across the 1964 Watanabe article in her dimerization research—Attorney Jones learned of the 1964 Watanabe article while reading Dow Patent No. 3,758,578. [Stip. ¶¶ 27 and 16.] [*See also* earlier findings in this opinion].

In the fall of 1973, Attorney Jones discussed the 1964 Watanabe article with Dr. Greene. He asked her if she had found it in the literature searches she had undertaken prior to applying for the original Greene patent in June, 1965, and she said no. Dr. Greene then went to the library to find out where the article appeared and why it had not been found during her literature search. Dr. Greene then determined that the article was printed in the *Chemical Abstracts* of February, 1965, but that it was not referenced in the *Chemical Abstracts* index until the end of 1965, after her prior art search had been completed. She further determined that it had been indexed under the heading "Nickel," not under the heading "Copper," and that therefore she would not have found the reference during her prior art searches

even if it had been referenced in the index prior to June 30, 1965, when the patent application was filed. [Defendant's Exhibit No. 135; Tr. 99–100, 228–230, 232–234, 360–362.]

During their discussion regarding the 1964 Watanabe article, Attorney Jones inquired about the nature of the Urishibara copper catalyst Dr. Watanabe reported using to convert benzonitrile and water to benzamide. Shortly thereafter Dr. Green found a book entitled *"New Hydrogenating Catalysts—Urishibara Catalysts"* by a Dr. Kazuo Hata. Dr. Greene sent a memorandum dated November 5, 1973 to Attorney Jones enclosing a copy of several pages in this book. Dr. Greene concluded that "the prior art teaches that Urishibara copper catalysts consist of finely divided copper metal and zinc." [Plaintiff's Exhibit No. Tr. 35; 232–234] Dr. Greene did not tell Attorney Jones that she had seen the 1964 Watanabe article in 1967 because she had forgotten about having seen it earlier. She did not recall having seen it prior to 1973 until after this lawsuit was filed and she was asked to help answer interrogatories. In that process she went through all of her "Inventor's Preliminary Disclosures" and found the reference to the Watanabe article in the file under nickel. [Defendant's Exhibit 33; Tr. 244–245; Plaintiff's Exhibit No. 33.]

While it is true that the 1964 Watanabe article deals principally with the use of nickel as a catalyst, it does, nevertheless, reflect results of tests using Urishibara copper as catalyst, and shows that Urishibara copper will catalyze at least one kind of nitrile, benzonitrile, to its corresponding amide, benzamide. Benzonitrile, Sohio asserts, is an aromatic nitrile, with a substantially different chemical composition and with qualities substantially different from those found in acrylonitrile, which is an aliphatic nitrile. It concludes, therefore, that considering the essentially unpredictable nature of a catalytic reaction, coupled with the fact that Watanabe's work reflected only reactions with an aromatic nitrile, achieving a similar result with a different catalyst (such as Urishibara copper)

applied to a different group of chemical components, (such as acrylonitrile—an aliphatic nitrile) was not sufficiently obvious to meet the requisites of 35 U.S.C. § 102(b).

Sohio's arguments are flawed. It is undisputed that the original Greene patent was rejected by the examiner as obvious under Watanabe—this because the scope of the original patent would have included Urishibara copper as a catalyst, and benzonitrile among the list of nitriles to which the reaction would have been applicable. Dr. Greene conceded that she included in the specifications and claims of the original patent several other nitriles, two of which she had not tested but which she had included because they were "very similar" to some of those she had tested. She clearly testified that she had tested the aromatic benzonitrile. [Tr. 305–306].

Sohio sought to overcome the examiner's initial rejection by deleting from its reissue application any reference to Urishibara copper as a catalyst; it also deleted any reference to benzonitrile as a catalyzed substance. (*See* findings, *supra*). Clearly, the reissue application was designed to avoid the impact of the original rejection.

█ It is the law, of course, that a patent is presumed valid, that the burden of establishing invalidity rests upon the party attacking the validity, and that the patent office's experience and expertise are to be accorded substantial weight. 35 U.S.C. § 282; *Kalman v. Kimberly-Clark Corp.*, 713 F.2d 760 (Fed.Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 1284, 79 L.Ed.2d 687 (1984). *SSIH Equipment, S.A. v. U.S. INTERN. TRADE COM'N*, 718 F.2d 365 (Fed.Cir.1983). But it is likewise true, as Sohio has stated, that a hypothetical inventor is envisioned as working in his shop with all the prior art references—which he is presumed to know—hanging on the walls around him. *General Battery Corp. v. Gould, Inc.*, 545 F.Supp. 731, 752 (D.Del. 1982) and cases cited therein. Thus, at the critical date in 1965, Dr. Greene possessed the requisite skill in the relevant art (by virtue of her Ph.D. in Chemistry coupled

with industrial experience) to be charged with knowledge of both the Reppe patent and the Watanabe work. Sohio indicates that only Watanabe is relied upon as providing "prior art" references for purposes of this Section 103 claim defense by Cyanamid. Cyanamid's 35 U.S.C. § 282 Amended notice under 35 U.S.C. § 282 (Document 146) clearly lists both Reppe and Watanabe as such references.

■ While the Court has previously held that reissue patent was not anticipated by the Reppe patent, it did not exist in a vacuum, for purposes of the "obviousness" claim. Both it and Watanabe's writings were "affixed to the walls" of Dr. Greene's laboratory while her work on the original patent (and, of course, the reissue patent) were underway.

Read together, it is clear to this Court that the results taught by Greene were clearly anticipated by these two indicia of the prior art.[8]

Reppe clearly indicates that a hydrolysis-type reaction converting a crude nitrile to its corresponding amide can be achieved using a copper catalyst. The only questions which remain in that context are whether the possible presence of bauxite in the crude material catalyzed caused the catalysis, i.e. whether the copper was the effective medium, or whether the amide was present during preparation of the catalyst material. (See above). Assuming, arguendo, that the question of "which came first" was left open by Reppe, the answer surely became clear in the light of results obtained by Watanabe. None of his raw materials, and none of his catalysts, involved bauxite. And, while his examinations were directed principally towards the use of nickel catalysts, his use of Urishibara copper as a catalytic agent, and the results produced, answered the question which Reppe's work perhaps left open—that copper, not bauxite, was the effective

agent producing a catalysis in Step 2 of the process of a nitrile to an amide under conditions substantially similar, if not absolutely identical, to those found by Dr. Greene.

Nor does the assertion that Watanabe's results involved tests using aromatic, as opposed to aliphatic, nitriles weaken this conclusion. Undoubtedly, Reppe's results involved aliphatic nitriles. The only substantial vaguery was whether the effective agent was bauxite or copper. Watanabe answered this question: it was copper. That his test results were secured using aromatic nitrites does not destroy the obvious conclusion which they, read against the Reppe results, clearly yield as to aliphatic nitriles. Indeed, Dr. Watanabe, himself makes the necessary finding:

"In general, aromatic nitriles are hydrated to the corresponding amides, the yields of amides range from 30 to 90 per cent of the nitriles used except in special cases. *The reaction of aliphatic nitriles is somewhat complicated and is different from that of aromatic ones: the yield of the amides is comparatively lower than that from aromatic nitriles, and the hydration reaction is accompanied by side reactions forming some acidic compounds.* The catalysts used are Urishibara nickel, Raney nickel, 'stablized nickel' and related substances." (Emphasis added). *Wantanabe, supra* at 1325.

This statement, and the subsequent test results, coupled with the data provided by the Reppe patent render the Greene "invention" obvious, not simply "obvious to try". *Novo Industry A/S v. Travenol Laboratories Inc.,* 677 F.2d 1202, 1208 (7th Cir. 1982). (FN—The Court has disregarded the 1982 deposition of Dr. Watanabe.) It is simply not relevant to the state of the art in 1965. It was not available at that time and could by no stretch of the imagination be deemed any part of the papers "hanging on the wall" at that time. As Sohio points

---

8. Obviousness is, of course, a conclusion of law based upon fact determinations. In reaching the subject finding herein, the Court has considered all the relevant evidence on the pertinent issues and has weighed it, in the obvi-

ous/nonobvious balance required by case law. See *Environmental Designs, Ltd. v. Union Oil Co., of Cal.,* 713 F.2d 693, 695 (Fed.Cir.1983), *cert. denied,* — U.S. ——, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984).

out in its post-trial memorandum, what Dr. Watanabe wrote in 1965 is part of the prior art; what he said in 1982 about what he wrote in 1965 is not.

### V. Fraud and Inequitable Conduct

■ The Court has carefully and thoroughly examined the factual bases for Cyanamid's claim that: 1) Sohio failed to disclose the Watanabe reference during prosecution of the original patent and, 2) that during the reissue proceedings, Sohio knowingly misrepresented to the patent office the date office when it first became aware of the Watanabe reference.

The facts do not support either claim. It is true that the barebones allegations have the color of accuracy but a fair evaluation of Dr. Greene's conduct at the critical times does not produce the fraudulent or even grossly negligent variety of acts sufficient to support either of Cyanamid's claims. Rather, Dr. Greene's level of fault was more on the order of simple lack of care, or negligence. She obviously failed to recognize the requisite import of the Watanabe article when she first encountered it in April of 1967 and she was in error in failing to do so. That she was charged with the knowledge of what it meant for purposes of the "obviousness" claim is one thing; that she failed to recognize what this court has found it taught is something else, indeed. Further, Attorney Jones' reissue application affidavit, while perhaps technically incorrect, was predicated on information furnished to him by Dr. Greene, which information reflected Dr. Greene's perception of the implications of Watanabe, in the sense of what she *believed* it taught at the critical times, as opposed to the *meaning* of its teaching. The Court believes that she did not carefully study, and therefore was not aware of, Watanabe's copper-catalyst test results until some time after (the original patent) was issued.

The facts do not support a finding that Dr. Greene, or any other agent, employee or attorney for Sohio, is guilty of the kind of "egregious conduct" that the fraud and inequitable conduct claim requires. *Ortho-*

*pedic Equipment Co. Inc. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376, 1383 (Fed.Cir.1983) and cases cited therein. Rather, the Court believes that the record warrants only a finding of simple negligence, oversight or erroneous judgment, not founded on bad faith. *Oetiker v. Jurid Werke GmbH*, 671 F.2d 596, 600 (D.C.Cir. 1982). That there was—error, even negligence, is clear—but there was no fraud.

### IV. Laches—Estoppel

■ Nor is Cyanamid entitled to rely on the defenses of laches or estoppel. The suit was filed within the six year statute of limitation contained in 35 U.S.C. § 286, and Cyanamid bears the burden of proof. Laches may be raised as a defense within the 6 year period of statute of limitations, but defendant has a 2 step burden of proof. It has not carried this burden. *Studiengesellschaft Kohle mbH v. Eastman Kodak, Co.*, 616 F.2d 1315, 1326 (5th Cir.), *cert. denied*, 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980).

The parties have stipulated that during licensing negotiations between Sohio and Cyanamid, defendant Cyanamid would reveal neither the nature of the catalyst it was using, nor the operating condition of its process. Indeed, the facts reveal that neither was disclosed to Sohio until discovery during the course of this suit, and then only upon the Court's issuance of a protective order.

Although Sohio's suspicions of a possible infringement had been present for several years, Sohio filed suit within a reasonable time after Cyanamid sought patent protection of a process utilizing a copper magnesium silicate catalyst which indicated the desirability of monovalent or divalent copper in addition to metallic copper in enhancing the process. (U.S. Patent Nos. 4,163,735 and 4,178,310 issued to Cyanamid on August 7, 1979 and December 11, 1979, respectively, [see Plaintiff's Exhibit Nos. 42 and 43]. This suit was filed on April 16, 1980. Clearly, Cyanamid's process in suit was, and remains, a "closely guarded secret". There is a total absence of evidence

that Sohio "knew, or in the exercise of reasonable diligence should have known of the defendant's alleged infringing evidence" at an earlier time. *Studiengesellschaft Kohle mbH v. Eastman Kodak Co.,* 616 F.2d 1315, 1326 (5th Cir.), *cert. denied,* 449 U.S. 1014, 66 L.Ed.2d 473, 101 S.Ct. 573 (1980) see also *Shaffer v. Rector Well Equipment Co.,* 155 F.2d 344, 347 (5th Cir.1946).

Judgment will be entered in accordance with this opinion.