The **STANDARD OIL COMPANY,**
Appellant/Cross-Appellee,

v.

**AMERICAN CYANAMID COMPANY,**
Appellee/Cross-Appellant.

**Appeal Nos. 84–1519, 84–1552.**

United States Court of Appeals,
Federal Circuit.

Sept. 25, 1985.

Eben G. Crawford, Squire, Sanders & Dempsey, Cleveland, Ohio, argued for appellant/cross-appellee. With him on brief was Daniel R. Cherry, Cleveland, Ohio; Gary R. Plotecher, Standard Oil Co., Cleveland, Ohio, of counsel.

Jamie S. Smith, Allegretti, Newitt, Witcoff & McAndrews, Ltd., Chicago, Ill., argued for appellee/cross-appellant. With her on brief were Jon O. Nelson, Stephen F. Sherry and D. Dennis Allegretti, Chicago, Ill.; Gordon L. Hart, American Cyanamid Co., Stamford, Conn., of counsel.

Before RICH and DAVIS, Circuit Judges, and COWEN, Senior Circuit Judge.

RICH, Circuit Judge.

This appeal is from the final judgment of the United States District Court for the Eastern District of Louisiana, entered on May 31, 1984 [1] dismissing the complaint and based on the holding that U.S. Reissue Patent No. 28,525, entitled "Process for Hydrolyzing Nitriles," assigned to plaintiff-appellant/cross-appellee The Standard Oil Co. (Sohio) by the inventors, Janice L. Greene and Murrel Godfrey, is invalid and, if valid, not infringed by defendant-appellee/cross-appellant American Cyanamid Company (Cyanamid). Cyanamid also cross-appeals from the district court's failure to award attorney fees and costs against Sohio under 35 U.S.C. § 285. We *affirm* the district court's judgment and *remand* for affirmative action on attorney fees.

### Background

This patent infringement action involves a catalytic process used primarily to manufacture acrylamide $(CH_2{=}CH{-}CONH_2)$,

---

1. This judgment, dated May 28, 1984, was entered pursuant to the court's opinion of April 10, 1984, published at 585 F.Supp. 1481, 224 USPQ 210.

which is a valuable organic chemical with a growing list of important commercial applications. It has been described by the parties hereto as the precursor for compounds used in pollution control and energy development and as "a preferred starting material" for the production of polymers used in municipal and industrial water treatment, pulp and paper processing, textile treatment, food processing, and other applications. The production of acrylamide is now a major competitive business in the United States.

Acrylamide is a monomer, made by combining a molecule of water with a molecule of acrylonitrile. Prior to the 1960's, acrylamide was produced by a two-step process, using sulfuric acid and ammonia. The two-step process had several drawbacks, consuming large quantities of sulfuric acid and ammonia while producing a relatively low yield of acrylamide and also resulting in a by-product (ammonium sulfate) not always easily or profitably disposed of.

In June, 1965, two of Sohio's research chemists applied for a patent on a one-step process which produced acrylamide from acrylonitrile by using a copper catalyst. On April 30, 1968, U.S. Patent No. 3,381,-034 (the "original Greene patent") was issued to Sohio as assignee of Dr. Janice Greene and Mr. Murrel Godfrey.

In September, 1973, John Jones, one of Sohio's patent attorneys who prepared and prosecuted the original Greene patent application, learned of a 1964 Japanese article by Dr. Kenichi Watanabe (the "Watanabe article") which he felt was relevant to the validity of the original Greene patent examiner. The Watanabe article related primarily to the use of metallic nickel as a catalyst but also disclosed a catalytic conversion of an aromatic nitrile, benzonitrile, to its corresponding amide, benzamide, by using a catalyst known as Urushibara copper.

After discussing the Watanabe article with Dr. Greene, who affirmed that she had not seen the article before she and Godfrey applied for the patent, Jones filed an application on behalf of Sohio to reissue the original Greene patent. The specification and claims of the reissue application were identical to the original Greene patent except for the removal of all references to the conversion of aromatic nitriles and benzonitrile, which the original patent had included within the invention disclosed and claimed, both generically and specifically. The examiner originally rejected all claims of the reissue application as being obvious in view of the Watanabe article. After a personal interview in which attorney Jones pointed out that the Watanabe article disclosed the use of Urushibara copper, which, he argued, is metallic copper and outside the scope of the claims in the reissue application, the examiner allowed the reissue application. The patent was reissued on August 19, 1975, as Reissue No. 28,525 (the "Greene reissue patent").

Claim 2 of the Greene reissue patent reads, in pertinent part,

The process for hydrolyzing a nitrile ... comprising contacting said nitrile with water ... in the presence of copper ion, said copper ion being at least partially soluble in water, the nitrile or in both water and nitrile and said copper ion being composed of copper in a combined valence state of $Cu^\circ + Cu^+$, $Cu^\circ + Cu^{++}$, or $Cu^\circ + Cu^+ + Cu^{++}$....

Since the original Greene patent issued in 1968, numerous patents have issued on the basic process disclosed therein. Today, every known manufacturer of acrylamide throughout the world uses a one-step process employing a copper catalyst. In the United States, acrylamide is currently manufactured by Cyanamid, Dow Chemical Company, and Nalco Chemical Company.

Sohio manufactured acrylamide through its subsidiary Vistron from 1969 to 1975 but did so using the sulfuric acid/ammonia process. Sohio has not made acrylamide since June, 1975, and has never commercially manufactured an amide from a nitrile by the process claimed in the Greene reissue patent, nor has it marketed a catalyst or had a licensee under that patent.

### The Cyanamid Process

Cyanamid manufactured acrylamide from acrylonitrile and water using the sul-

furic acid/ammonia process beginning in 1954, and discontinued use of that process in 1977. Beginning in August, 1968, Cyanamid undertook a project to develop a catalytic process for the selective conversion of acrylonitrile and water solely to acrylamide. Since September, 1973, Cyanamid has operated a process using a "metallic copper catalyst," to be distinguished from copper ion, to catalyze conversion of acrylonitrile to acrylamide. The catalyst used in Cyanamid's process is essentially pure metallic copper (Cu°, or zero valence copper), produced by passing hydrogen gas over pellets composed of copper compounds to reduce them to metallic copper. Although Cyanamid takes steps to insure that no copper ions ($Cu^+$ or $Cu^{++}$, copper with a valence number of one or two) are introduced into the process, tests of Cyanamid's reactor effluent showed that it contained minute quantities of soluble copper ions, on the order of one or two parts per million, referred to by the trial judge as "minute."

In October, 1974, Sohio believed that Cyanamid might be using its patented process in its commercial acrylamide plant in Fortier, Louisiana. Although Sohio offered Cyanamid a license under the original Greene patent in December, 1974, Cyanamid took the position that it did not need a license, and there were no further negotiations between the parties. Sohio filed this suit on April 16, 1980, after reissuing its patent, seeking compensation for patent infringement in the form of a reasonable royalty and, in addition, seeking increased damages and attorney fees for willful infringement. Cyanamid denied infringement and counterclaimed for a declaration that the Greene reissue patent is invalid and unenforceable because of fraud and also sought an award of attorney fees against Sohio for bringing a "baseless infringement suit."

### The District Court's Opinion

Trial was to the court without a jury. Sohio asserted infringement of only claim 2 of the Greene reissue patent. We shall now briefly summarize the court's extensive opinion.

The district court held that the Greene reissue patent was not infringed by Cyanamid. While Sohio's patented process makes use of copper ions that are "at least partially soluble in water, the nitrile or in both water and nitrile," the court specifically found that the catalyst used by Cyanamid is not "at least partially soluble" and also found that the Cyanamid metallic copper catalyst was specifically disclaimed by Sohio in its reissue application.

The court also held that the Greene reissue patent was invalid because it did not satisfy the disclosure requirements of 35 U.S.C. § 112 and because the claimed invention was obvious under 35 U.S.C. § 103. The court found (with some confusion on its part discussed infra) that the term "at least partially soluble" as used in claim 2 did not meet the "full, clear, concise and exact" requisites of the first paragraph of § 112 and also held that "partially soluble" was too vague to meet the requirement that the inventor shall particularly point out and distinctly claim the invention, as required by the second paragraph of § 112.

The court went on to hold claim 2 invalid for obviousness under § 103 based on two prior art references, U.S. Patent No. 1,891,055, issued in December, 1932, to Walter Reppe (the "Reppe patent") and the Watanabe article. After examining the disclosures in these references, the court concluded that, when read together, they rendered the invention of claim 2 obvious within the meaning of § 103.

Finally, the court determined that the facts did not support a holding of "egregious conduct" or fraud committed by Sohio either in procuring its patent or in bringing the infringement suit. It was apparently on this basis that the court made no award of attorney fees to the prevailing party, Cyanamid.

The opinion having been filed, judgment was thereafter entered simply dismissing the complaint with prejudice.

## OPINION

### A. *Infringement*

A patent confers the right to exclude others from making, using, or selling the invention defined by the claims. 35 U.S.C. § 154. A determination of patent infringement under 35 U.S.C. § 271(a) involves a two-step analysis of each asserted claim: first, the language of the claim must be interpreted; and second, it must be determined whether the claim "reads on" the accused product or process, that is, whether the claimed invention is being made, used, or sold by the alleged infringer. The first is a question of law for the court, the second an issue of fact. *See Kalman v. Kimberly-Clark Corp.,* 713 F.2d 760, 771, 218 USPQ 781, 788–89 (Fed.Cir.1983).

▆ The requirements for the specification and claims are separately set forth in the first two paragraphs of 35 U.S.C. § 112 (emphasis ours):

The *specification* shall contain a written *description* of the invention, and of the manner of making and using it, in such full, clear, concise and exact terms *as to enable* any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the *best mode* contemplated by the inventor of carrying out his invention.

The specification shall conclude with *one or more claims* particularly pointing out and *distinctly claiming* the subject matter which the applicant regards as his invention.

The allowability, or validity, of a claim depends, of course, on its subject matter meeting the statutory requirements for patentability and on the claim, per se, being "distinct"—i.e., having a clear and definite meaning when construed in the light of the complete patent document.

The second paragraph of § 112 deals with the claims only. The first paragraph does not apply to. claims but to "written description." It requires that the inventor adequately disclose three separate items: (1) the invention itself (the "description" requirement); (2) the manner and process of making and using the invention (the "enablement" requirement); and (3) the best mode contemplated by the inventor, at the time of filing, in carrying out the invention (the "best mode" requirement). The descriptive part of the specification aids in ascertaining the scope and meaning of the claims inasmuch as the words of the claims must be based upon the description. The specification is, thus, the primary basis for construing the claims.

Finally, the prosecution history (sometimes called "file wrapper and contents") of the patent consists of the entire record of proceedings in the Patent and Trademark Office. This includes all express representations made by or on behalf of the applicant to the examiner to induce a patent grant, or, as here, to reissue a patent. Such representations include amendments to the claims and arguments made to convince the examiner that the claimed invention meets the statutory requirements of novelty, utility, and nonobviousness. Thus, the prosecution history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance.

In its interpretation of claim 2 of the Greene reissue patent, the district court found that claim 2 is directed to a "process of hydrolyzing a nitrile with water" in the presence of a copper catalyst that consists of "a copper ion" which is "at least partially soluble." The key to interpreting claim 2 is, therefore, determining the exact nature of the "copper ion" catalyst used in the process.

The district court noted that the specification of the Greene reissue patent expressly states that "metallic copper when used alone is ineffective" in the process.[2] In addition, the court noted that attorney Jones' response to the examiner's rejection

---

**2.** While the record shows that this was the opinion of the patentees on the basis of their limited research, the record also shows that they were mistaken in their belief.

of all claims in the reissue application pointed out that Watanabe disclosed the use of Urushibara copper, which "is in fact metallic copper which is outside [the] claims" of the reissue application. By making this disclaimer or concession, Sohio surrendered any interpretation of its claim that would include metallic copper catalysts.

In determining whether the claim as thus interpreted reads on the Cyanamid process, the district court found that the Cyanamid process involved a "painstaking procedure to reduce certain copper compounds to pure metallic copper to perform a catalytic process that converts acrylonitrile to acrylamide," and that Cyanamid's catalyst "is a solid, insoluble catalyst, comprised of metallic copper, as pure as industrial chemical methods are capable of producing."

■ Comparing the two processes, the court found that the Greene reissue patent describes a catalyst that has copper ions in solution (a homogenous catalyst), while the Cyanamid catalyst does not have copper ions in solution. The Cyanamid catalyst is, rather, a solid insoluble catalyst that is essentially metallic copper. The court properly concluded there was no infringement by Cyanamid on the basis of Sohio's disclaimer of the use of metallic copper and also because Cyanamid's catalyst was not "at least partially soluble in water, the nitrile, or in both water and nitrile" within the meaning of claim 2. We agree with this interpretation and finding of non-infringement and therefore affirm it.

## B. *Validity*

We now turn to the issue of validity of claim 2 of the Green reissue patent. Section 282 of Title 35 provides that a party charged with infringement may assert several bases for invalidity, including "any ground stated in part II of this title as a condition for patentability" (i.e., failure to satisfy, inter alia, any one of the requirements of novelty, utility, or nonobviousness, §§ 101, 102, and 103) and "failure to comply with any requirement of Sections 112 or 251 of this title."

The district court held claim 2 of the Greene reissue patent invalid for both indefiniteness under § 112, second paragraph, and for obviousness under § 103. We affirm both holdings.

### 1. *Indefiniteness*

■ The district court concluded that claim 2 was invalid because the term "partially soluble" was insufficiently precise to meet the "full, clear, concise and exact" requirement of 35 U.S.C. § 112, first paragraph (the enablement requirement), which was a misapplication of the statute, and also correctly concluded that "partially soluble" was too vague to "particularly point out and distinctly claim" the subject matter of the invention as required by the second paragraph of § 112, the claim requirement.

Although we agree claim 2 is invalid because of its failure to satisfy the requirement of distinctly claiming the invention, we point out that the first paragraph of § 112 applies only to the disclosure portion of the specification, not to the claims. The error was harmless, however, because the court also applied the right statutory provision.

We affirm this ground for holding claim 2 invalid.

### 2. *Obviousness*

A patent may also be held invalid if the invention claimed does not satisfy the requirement for nonobviousness, 35 U.S.C. § 103, which reads:

· A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

*Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545, 148 USPQ 459, 467 (1966), thus articulated

the test for determining obviousness under § 103:

> [T]he scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the art resolved. Against this background, the obviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy.

In considering the obviousness issue, the district court stated that "a hypothetical inventor is envisioned as working in his shop with all the prior art references—which he is presumed to know—hanging on the walls around him," citing in support a 1982 District of Delaware opinion.[3] The court then proceeded, however, to determine that the real inventor, Dr. Greene, possessed the requisite skill, "by virtue of her Ph.D. in Chemistry," to be personally charged with knowledge of both of the prior art references, the Reppe patent and the Watanabe article. While the court's holding that claim 2 of the Greene reissue patent defined an obvious invention was correct, the court's reasoning in reaching that conclusion was based on some all-too-often misconstrued and now obsolete principles of the obviousness inquiry.

■ The issue of obviousness is determined entirely with reference to a *hypothetical* "person having ordinary skill in the art." It is only that hypothetical person who is presumed to be aware of all the pertinent prior art. The actual inventor's skill is irrelevant to the inquiry, and this is for a very important reason. The statutory emphasis is on a person of *ordinary* skill. Inventors, as a class, according to the concepts underlying the Constitution and the statutes that have created the patent system, possess something—call it what you will—which sets them apart from the workers of *ordinary* skill, and one should not go about determining obviousness under § 103 by inquiring into what *patentees* (i.e., inventors) would have known or would likely have done, faced with the revelations of references. A person of ordinary skill in the art is also presumed to be one who thinks along the line of conventional wisdom in the art and is not one who undertakes to innovate, whether by patient, and often expensive, systematic research or by extraordinary insights, it makes no difference which. See the last sentence of § 103, supra.

It was up to the court here to determine the level of skill of the hypothetical person of *ordinary* skill and what that person would have been able to do when in possession of the prior art, the scope and contents of which the court has also determined. For a more extensive, and the latest, discussion of this court's views on *who* is presumed to know the prior art, see *Kimberly-Clark Co. v. Johnson & Johnson*, 745 F.2d 1437, 1449–1454, 223 USPQ 603, 610–614 (Fed.Cir.1984).

■ Although the court here correctly determined the level of skill and prior art questions, the court's discussion of what skill Dr. Greene possessed was beside the point for the reasons discussed in *Kimberly-Clark*. The relevant inquiry was the court's assessment of the two prior art references. In that regard, the court specifically found that the Reppe patent discloses the use of a metallic copper catalyst to convert a nitrile to an amide. Example 2 of Reppe discloses conversion of an aliphat-

---

**3.** This visual imagery originated, however, in 1966 in our predecessor court in the case of *In re Winslow*, 365 F.2d 1017, 151 USPQ 48 (CCPA 1966). It has attained an unfortunate popularity with the judiciary. In the nearly two decades since that opinion, this court and the CCPA considerably modified their views. As may be seen from *Winslow*, the picturesque phraseology was born out of a disagreement with the late Judge Arthur Smith who vigorously dissented on the obviousness issue. It was rather promptly modified by the CCPA in *In re Antle*, 444 F.2d 1168, 168 USPQ 717 (CCPA 1971).

ic nitrile to a small amount of aliphatic amide using a metallic copper catalyst. The Watanabe article teaches that a type of metallic copper, Urushibara copper, is a useful catalyst for converting at least one aromatic nitrile, benzonitrile, to its corresponding amide, benzamide. The court found that the combined teachings would have indicated to one of ordinary skill in the art that copper was an effective agent for producing a catalysis in the process of converting a nitrile to an amide.

Sohio contends that the district court ignored secondary indicia of nonobviousness, including the fact that "every known manufacturer of acrylamide now uses a one-step catalytic process." However, the fact is that Sohio has never licensed the Greene reissue patent to any of these manufacturers, and Sohio itself never used the process commercially. There evidently being no "secondary considerations" respecting the actual invention of claim 2, the district court's conclusion of obviousness of the subject matter of claim 2 was entirely correct.

### C. *Attorney Fees*

Section 285 of Title 35 provides that a district court "in exceptional cases may award reasonable attorney fees to the prevailing party." In this case, both parties sought attorney fees in the court below, Sohio accusing Cyanamid of willful infringement and Cyanamid accusing Sohio of bringing a "baseless" infringement suit. Cyanamid also asserted that Sohio consciously failed to disclose the Watanabe reference during prosecution of the original patent application and misrepresented to the PTO the date when it first became aware of the Watanabe reference.

■ The district court found that neither Dr. Greene nor any other agent of Sohio was guilty of fraud or gross negligence in the PTO, concluding instead that a finding of simple negligence or oversight was more appropriate. Although a finding of inequitable conduct or "fraud in the Patent and Trademark Office" is often a basis for a district court to find that a case is "excep-

tional," it is not a prerequisite to an award of attorney fees under § 285.

Circumstances other than inequitable conduct in the procurement of a patent may support a finding of an "exceptional" case. Other exceptional circumstances include willful infringement, misconduct during litigation, vexatious or unjustified litigation, or a frivolous suit. *See, e.g., Bayer Aktiengesellschaft v. Duphar International Research B.V.*, 738 F.2d 1237, 1242, 222 USPQ 649, 652 (Fed.Cir.1984); *Hughes v. Novi American, Inc.*, 724 F.2d 122, 125, 220 USPQ 707, 710 (Fed.Cir.1984); *Stickle v. Heublein, Inc.*, 716 F.2d 1550, 1564, 219 USPQ 377, 387 (Fed.Cir.1983); *Orthopedic Equipment Co. v. All Orthopedic Appliances*, 707 F.2d 1376, 1384, 217 USPQ 1281, 1287 (Fed.Cir.1983).

■ The district court, so far as we can determine, made no definitive finding on the issue of exceptional case and did not specifically deny an award of attorney fees to the prevailing party, Cyanamid. Because a court may award attorney fees in a case where circumstances demonstrate that litigation is baseless, as Cyanamid contends it is here, we remand this case to the district court for a determination of whether it is exceptional within the meaning of § 285 and in light of the foregoing precedents.

### CONCLUSION

The judgment of the district court with respect to the issues of validity and infringement is *affirmed,* and the case is *remanded* to the district court to determine whether an award of attorney fees to the prevailing party under § 285 is warranted.

AFFIRMED AND REMANDED.