**McNEIL–PPC, INC., Plaintiff,**

v.

**The PROCTER & GAMBLE COMPANY, Procter and Gamble Distributing Company, and Procter & Gamble Paper Products Company, Defendants.**

Civ. A. No. 90–B–2029.

United States District Court,
D. Colorado.

March 20, 1991.

Frederick J. Baumann, Peter L. Edwards, Rothgerber, Appel, Powers & Johnson, Denver, Colo., Philip S. Johnson, Dianne B. Elderkin, Lynn B. Morreale, Woodcock Washburn Kurtz Mackiewicz & Norris, Philadelphia, Pa., for McNeil.

Allen H. Gerstein, Carl E. Moore, Jr., Marshall, O'Toole, Gerstein, Murray & Bicknell, Chicago, Ill., Fredrick H. Braun, Larry L. Huston, Procter & Gamble Co., Cincinnati, Ohio, H. Thomas Coghill, Paul E. Goodspeed, Coghill & Goodspeed, Denver, Colo., for Procter & Gamble.

FINDINGS OF FACT, CONCLUSIONS
OF LAW AND ORDER

KANE, Senior District Judge.

## BACKGROUND

McNeil–PPC (a subsidiary of Johnson & Johnson) has moved for a preliminary injunction against Procter & Gamble. P & G is introducing a product which PPC claims infringes on a PPC patent. The product is a new "ultra-thin" external feminine sanitary napkin which P & G plans to market under the brand name, "Always Sheer Confidence." The patent at issue is PPC's *Bradstreet* patent: number 4,217,901, issued August 19, 1980. The patent describes a thin, crush resistant, highly absorbent sanitary napkin. In 1970, PPC introduced the first beltless napkin which was attached by adhesive to the wearer's garment. Subsequent refinements of the product yielded PPC's "Sure and Natural Thin–Maxi Pad" in 1980. Thin-maxi pads are, as the name suggests, more thin than the maxi-pad. As the product evolved, the goal became one of producing thinner pads which absorbed as much as thicker ones.

Producing a thin pad which absorbs as much as thicker ones is accomplished by using particulate hydrocolloid material. Colloquially called, "superabsorbers," these particles absorb liquid keeping it away from the wearer's body. In addition to absorbency, the inventor was concerned with dimensional stability. Thinner pads are more likely to twist, crush or "rope" out of position.

The gist of the *Bradstreet* invention is a thin, crush resistant external sanitary napkin with the absorbency of a thicker pad and the comfort of a thinner product. Hoping to be first on the market and to protect that position with its *Bradstreet* patent, PPC began testing its ultra-thin product in 1989. PPC's project name for this product is "Stingray;" the ultra-thin product is now sold under PPC's "Sure and Natural" label.

In early 1990, P & G test marketed a similar, "ultra-thin" napkin under its label, "Always Sheer Confidence." The "Always" product entered the market in the first quarter of 1991. According to PPC, the P & G product infringes on its *Brad-street* patent. On November 14, 1990, PPC filed suit, and on the same day, PPC filed a motion for preliminary injunction asking me to block P & G from introducing its "Always" ultra-thin napkin.

A hearing on PPC's preliminary injunction motion was held January 22–25, 31 and February 1. Because I conclude plaintiff failed to show a likelihood of success on the merits at trial and failed to demonstrate irreparable harm if P & G were not enjoined, I deny plaintiff's motion.

## FINDINGS OF FACT

1. Plaintiff, McNeil–PPC is an affiliate of Johnson & Johnson. Johnson & Johnson is a leading manufacturer of health care, pharmaceutical and consumer products, with over 9 billion dollars of sales worldwide.

2. One of McNeil's divisions, Personal Products Company, headquartered in Milltown, NJ, manufactures and markets a variety of sanitary napkin products.

3. Defendant, the Procter and Gamble Company, manufactures a complete line of external sanitary napkins called "Always Sheer Confidence" "Ultra Plus" which competes with PPC.

4. The patent-in-suit, entitled "Crush Resistant Adhesively–Attached Absorbent Product," was issued to two PPC employees, James Bradstreet and Judith Roller.

5. The application which became the *Bradstreet* patent, number 4,217,901, was filed on October 6, 1978.

6. PPC contends Claim 1 of the *Bradstreet* patent is valid and infringed. Divided into 6 subparts, Claim 1 reads:

a thin catamenial absorbent product for adhesive attachment to a wearer's garment comprising:

a planer, generally rectangular, absorbent pad having a body-facing major surface and a garment-facing major surface;

an outer cover overlying at least the garment-facing major surface;

a pressure-sensitive adhesive element disposed on said outer cover for adhering said product to a wearer's garment; and

means for providing said pad with planar crush resistance, said means comprising providing on said garment-facing major surface of the pad and integral therewith, a densified, compacted, porous, absorbent, fibrous layer having a particulate hydrocolloid material distributed therein;

said hydrocolloid material being capable of absorbing water in an amount which is at least 10 times its own weight in dry form and comprising not more than 50% by weight of said densified layer; said product having a thickness of from about 3.0 to about 7.0 millimeters and having a crush resistance of from about 1.0 to about 3.0 pounds per square inch.

### A. *Validity of the Patent.*

7. Jason Lipow prosecuted the patent before the U.S. Patent and Trademark Office on Johnson & Johnson's behalf. All of the claims in the original application were rejected. The primary reference relied upon by the examiner was another Johnson & Johnson patent to *Aberson,* number 4,103,062.

8. In response to this initial rejection, Lipow amended the specifications, canceled the old claims, substituted new claims, and offered arguments as to why the new claims were patentable. This was successful, and the new claims were allowed.

9. The new claims added a new limitation that the product have "a thickness of from about 3.0 to about 7.0 millimeters."

10. There was no prior art cited by the examiner showing a thin, crush-resistant sanitary napkin.

11. The patent applicants were aware of prior art showing how to make a thin, crush resistant sanitary napkin.

12. One piece of prior art, which was known to Lipow and which taught a thin, crush resistant sanitary napkin, was the *Ishikawa* patent.

13. A reasonable patent examiner who knew about *Ishikawa,* containing as it does both a disclosure of a thickness range of "about 3 to about 7 mm" and a teaching about resistance to deformation, would have considered *Ishikawa* pertinent.

14. Another prior art reference which disclosed a thin, crush resistant sanitary napkin was a product called FINESSE, introduced by Unilever. The patentees knew about FINESSE.

15. Unilever obtained a patent on the FINESSE product, which issued to an individual named Melican.

16. The testimony of P & G's patent law expert, Dr. Donald Banner was both informed and credible. I accept his conclusion that there is a serious question whether the teaching in *Bradstreet* is obvious and there are serious doubts whether the innovation is patentable.

17. *Bradstreet*'s failure to cite the best mode of the claimed invention creates further doubt about the patent's validity.

18. Plaintiff's commercial specifications for its thin product was dated October 4, 1978, the very same day as the inventors signed their patent application. Those specifications require the fluff pad, after it has been sprayed with water and densified, to be dried under compression for thirty days. Drying under compression or confinement was necessary to obtain a thin product.

19. Statements attributable to both inventors emphasize the drying process as important to maintaining dimensional stability.

20. There is no disclosure of drying under compression in *Bradstreet.*

### B. *Infringement of the Patent.*

21. The P & G product is a thin catamenial absorbent product for adhesive attachment to a wearer's garment.

22. The Bradstreet patent is directed to a "skin" containing superabsorbents on a fluff pad. The original invention disclosure, submitted by the inventors specifically refers to forming a skin by spraying the pad with water and compressing the superabsorbent material.

23. Incorporating a skin into fluff pads is discussed in earlier patents. One such patent is *Burgeni,* number 3,017,304. Another patent which disclosed a skin-like structure was *Aberson.* Unlike *Burgeni,*

*Aberson* calls for superabsorbers to be distributed throughout the pad.

24. Although *Bradstreet* itself does not use the word skin to describe its patented structure, it employs the terminology used in *Burgeni* and *Aberson.*

25. *Aberson* was the likely source of *Bradstreet*'s description of the pad as an "integral ... densified, compacted, porous, absorbent, fibrous layer".

26. The term "integral" is not a term of art in the sanitary napkin field, and is not defined in *Bradstreet.* Understanding the word, "integral," as it appears in *Bradstreet,* is enhanced by a reference to the file history of *Aberson.* In *Aberson,* two layers which are "integrally" connected are portions of the same batt. This reinforces the conclusion that *Bradstreet* described a *Burgeni* type skin.

27. Johnson & Johnson's patent attorney, Jason Lipow, discussed the relationship between the two "integral" layers in an amendment submission to the PTO on October 18, 1979: "... it is the cooperation between the layer and the remainder of the absorbent panel which determines the crush resistance."

28. The two layers of the P & G product are neither physically connected together nor integral. The two portions (the "secondary topsheet" and "C-fold layer") are able to move separately from each other.

29. The two layers in the P & G products are also not functionally integral in the manner *Bradstreet* describes. The two layers cooperate in absorbing fluid but not providing crush resistance.

30. The P & G product was designed by P & G's Dr. Osborn. Dr. Osborn set out to produce a "flexible," "bendable," "twistable" product. Magnetic resonance imagery illustrated a difference between the P & G and PPC products. The P & G product curved to conform to the user's body while the PPC product remained dimensionally stable.

31. The distribution of the superabsorber particles demonstrates another distinction between the products. *Bradstreet* instructs superabsorber be "distributed therein." Photographs of the PPC product, wetted with blue fluid, reflects this random application of particles throughout the pad.

32. In similarly produced photographs, the superabsorbers in the P & G product are laid in a thin layer between tissue giving the appearance of a sandwich.

33. Claim 1 of the patent-in-suit includes a limitation expressed in "means plus function" format. The function referenced in the claim is to provide the pad with planar crush resistance.

34. The function is quantified by a crush resistance test described in *Bradstreet.* The patent describes a resistance value from about 1.0 to about 3.0 psi. *Bradstreet* also teaches crush resistance should be measured at the first inflection point.

35. The crush resistance data at the first inflection point, as measured by Richard Chapman, give an average resistance value of 0.85 psi.

36. *Bradstreet* describes the thickness of its pad as about "3.0 to about 7.0." The patent, however, gives no instruction on how to measure the thickness of a sanitary napkin.

37. Using measurement methods, like the Ames gauge which is accepted in the industry, there are numerous measurements of the P & G product below 3.0 millimeters.

### C. *Irreparable Harm.*

38. The Market for external sanitary protection products in the U.S. is about one billion dollars per year. The market is relatively flat; its growth rate over the past few years is only one or two percent.

39. Sales of ultra-thin products are just beginning, and therefore, do not account for any substantial percentage of the market at present. Potential expansion for ultra-thin products in the long term is dramatic.

40. The short term impact (the time between the preliminary injunction hearing and trial) of ultra-thin products is uncertain.

41. Kimberly–Clark has already marketed an ultra-thin product in about 20–25 percent of the country. PPC has not taken any legal action against Kimberly–Clark although PPC's president stated the product infringes his *Bradstreet* patent.

42. PPC may aggressively market its product as well as P & G. Both have substantial clout with distributors and retailers. Even if PPC must, for the year to come, share first place with P & G and suffer some loss of brand recognition in the mind of the consumer, the product recognition will be enhanced by the advertising generated by the competition.

43. If PPC prevails at trial, PPC would enjoy the loyalty of all consumers sold on the ultra-thin concept. PPC would retain all its ultra-thin customers and garner new customers who previously used the P & G product. PPC could collect, as damages, for any extra promotional expenses it incurs in switching customer loyalty to its product.

44. If, at trial, PPC's patent were proved valid and infringed, its position in the external sanitary protection market would be formidable.

45. If an injunction does not issue, PPC claims it will suffer: a) idle equipment; b) laid-off workers; c) insufficient funds for research; d) inability to attract qualified people, and e) low morale. Money paid after the fact will remedy these alleged injuries.

46. If PPC prevails at trial, P & G is able to respond in damages. P & G's 1990 annual report shows cash and cash equivalents on hand of $1,400,000,000, and net 1990 earnings of $1,602,000,000.

47. During the period between injunction and trial, Johnson & Johnson would support PPC on the strength of its patent claim and the hope of success at trial. Even if PPC's fears become real and Johnson & Johnson divests PPC, there is no evidence a divested PPC would disintegrate.

48. Although PPC expressed fear that other PPC sanitary napkins could be affected by P & G's product, it presented no evidence of a likely scenario where PPC customers would switch to P & G's ultra-

thin product and later use other P & G products if P & G's ultra product is removed due to patent infringement, proven at trial.

## CONCLUSIONS OF LAW

1. This is an action for patent infringement arising under the patent laws of the United States, Title 35, United States Code. Jurisdiction is found under 28 U.S.C. § 1338(a), and venue is proper under 28 U.S.C. § 1400(b).

2. In patent cases, the law of the Federal Circuit governs the substantive law to be applied. 28 U.S.C. § 1295.

3. Injunctive relief in patent action is authorized by statute: 35 U.S.C. sec. 283, and by case law: *Smith v. International Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1577–79 (Fed.Cir.1983), *cert. denied*, 464 U.S. 996, 104 S.Ct. 493, 78 L.Ed.2d 687 (1983).

4. The Federal Circuit identified four factors to be weighed in evaluating a claim for preliminary injunction: 1) reasonable likelihood of success on the merits, 2) irreparable harm, 3) the balance of the hardships, and 4) the impact of the injunction on the public interest. *Hybritech Inc. v. Abbott Laboratories*, 849 F.2d 1446, 1451 (Fed.Cir.1988).

### A. *Validity of the Patent.*

5. A patent is entitled to presumptions of validity. 35 U.S.C. § 282; *Roper Corp. v. Litton Systems, Inc.*, 757 F.2d 1266, 1270 (Fed.Cir.1985).

6. The presumption of validity encompasses presumptions of novelty, nonobviousness, and utility. While deference is due the Patent and Trademark Office, its decision to issue a patent is only as good as the evidence it considered. *Structural Rubber Products Co. v. Park Rubber Co.*, 749 F.2d 707, 714 (Fed.Cir.1984).

7. A condition of patentability is that the invention be nonobvious, 35 U.S.C. § 103.

8. *Ishikawa* is more pertinent to the subject matter claimed in *Bradstreet* than

the art cited in the patent's prosecution before the PTO.

9. The FINESSE product is considered prior art.

■ 10. Under the direction of *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545 (1966), the analysis of P & G's Dr. Thomas Osborn, a person skilled in the art of sanitary napkin design and construction, is accepted. *Ishikawa* describes the same, crush resistant sanitary napkin. Hence, Claim 1 is obvious to one skilled in the art.

11. The patent law requires a patent application to set forth the "best mode" of carrying out the inventor's design. 35 U.S.C. § 112.

■ 12. The first inquiry in judging whether the inventor disclosed his best mode is a subjective inquiry into the inventor's state of mind. *Chemcast Corp. v. Arco Industries*, 913 F.2d 923, 926 (Fed. Cir.1990). The inventor must fully disclose his preferred method.

13. The second inquiry focuses on the level of skill in the relevant art in order to assess the adequacy of a best mode disclosure. The disclosure is directed to persons of ordinary skill in the art. *Randomex, Inc. v. Scopus Corp.*, 849 F.2d 585, 587 (Fed.Cir.1988).

14. Since drying under pressure was not discussed in *Bradstreet*, the best mode is not fully disclosed.

**B.** *Infringement of the Patent.*

15. Patent infringement is defined in 35 U.S.C. § 271, which states:

(a) Except as otherwise provided in this title, whoever without authority makes, uses, or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent.

16. PPC has the burden of proving infringement, and PPC must prove infringement by a preponderance of the evidence. *Hughes Aircraft Co. v. U.S.*, 717 F.2d 1351 (Fed.Cir.1983).

■ 17. In reading a patent claim, one considers the words of the claim, its specifications, and the prosecution history in the Patent Office leading to the issuance of the claim. *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 867 (Fed.Cir.1985).

■ 18. The principal source of the meaning of terms used in a patent claim is the patent itself. *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 453 (Fed.Cir.1985).

■ 19. The patentee has the right to choose his own words in describing his invention. *Loctite Corp.*, 781 F.2d at 867.

20. Based on Johnson & Johnson's patent attorney Lipow's description, and the language in *Aberson*, *Bradstreet*'s use of the word "integral" probably excludes a product with two independent layers.

21. Claim 1 of *Bradstreet* utilizes "means plus function" language. Such language is interpreted according to 35 U.S.C. § 112 para. 6.

■ 22. Means plus function language is subject to a two part analysis. First, does the accused device perform the identical function—in this case, planar crush resistance? Second, is the means used for performing this function one of those disclosed in the patent. Hence, even if the P & G product possessed crush resistance, the means for performing the crush resistance is not equivalent to the methods disclosed in *Bradstreet* since the hydrocolloid has no effect on crush resistance.

23. The P & G product does not utilize the same or equivalent structural means for providing the pad with planar crush resistance. The structure described in *Bradstreet* is a fluff/hydrocolloid mixture forming a skin on a fluff pad. The C-fold layer in the P & G product is not identical nor equivalent to a fluff/hydrocolloid mixture forming a skin on a fluff pad.

24. Claim 1 of the *Bradstreet* patent requires the infringing product to have a thickness from "about 3.0 to about 7.0 millimeters."

25. The evidence supports P & G's claim that its product is less than "about 3.0 mm."

26. Therefore, each element of Claim 1 of *Bradstreet* is not literally present in the P & G product.

27. Since PPC has not met its burden of proof and there are few findings of fact which indicate the P & G product "performs substantially the same function in substantially the same way to yield substantially the same result," *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950), PPC's infringement argument under the "doctrine of equivalents" is not accepted.

### C. *Irreparable Harm.*

28. Since *Bradstreet* has not been held "valid and infringed," nor is there a strong showing of likely success, PPC is not entitled to a presumption of irreparable harm as discussed in *Smith International*, 718 F.2d 1573, 1581.

29. On the merits, PPC has not made a strong showing that it will be irreparably harmed unless P & G is enjoined. If successful at trial, P & G can adequately respond in damages for any harm caused by its infringing product.

30. I find no reason to attempt to balance the hardships or determine the impact of an injunction on the public interest. Both considerations are conjectural at best.

Finding no likelihood of success and no irreparable harm,

IT IS ORDERED that plaintiff's motion for a preliminary injunction is denied.