**LIFE TECHNOLOGIES, INC.,**
**Plaintiff–Appellant,**

v.

**CLONTECH LABORATORIES,**
**INC., Defendant–Appellee.**

**No. 99–1550.**

United States Court of Appeals,
Federal Circuit.

Sept. 21, 2000

Robert J. Koch, Fulbright & Jaworski L.L.P., of Washington, DC, argued for plaintiff-appellant. With him on the brief was Scott H. Blackman, LYON & LYON L.L.P., of Washington, DC; Steven M. Bauer, Testa, Hurwitz & Thibeault, LLP, of Boston, Massachusetts; and Alan W. Hammond, Life Technologies, Inc., of Rockville, Maryland.

Marc R. Labgold, Piper Marbury Rudnick & Wolfe LLP, of Washington, DC, argued for defendant-appellee. With him on the brief were Catherine B. Richardson, Sharon E. Crane, and Kevin M. Bell, Long, Aldridge & Norman, LLP, of Washington, DC.

Before MICHEL, BRYSON, and GAJARSA, Circuit Judges.

GAJARSA, Circuit Judge.

Life Technologies, Inc. ("LTI") appeals the judgment of the United States District Court for the District of Maryland, entered after a bench trial, in which the court held that LTI's U.S. Patents Nos. 5,244,797 ("the '797 patent") and 5,668,005 ("the '005 patent") were unenforceable on the ground of inequitable conduct. Because the court premised this determination on clearly erroneous findings of fact, we reverse and remand.

## BACKGROUND

Reverse transcriptase ("RT") is a naturally occurring enzyme that exhibits DNA polymerase activity. DNA polymerase activity enables the RT enzyme to utilize a messenger RNA ("mRNA") molecule as a template to synthesize a complementary strand of DNA ("cDNA"). This reaction results in a DNA/RNA hybrid molecule. In addition to DNA polymerase activity, naturally occurring RT, known as "wild-type" RT, also exhibits RNase H activity. RNase H activity degrades the original mRNA template as the cDNA molecule is made. RNase H activity is undesirable because this degradation of the mRNA template negatively affects the ability and efficiency of the RT to make cDNA.

Beginning in the early 1980's, the inventors of the '797 and '005 patents, Drs. Michael Kotewicz and Gary Gerard, sought to develop a genetically engineered RT enzyme that exhibited DNA polymerase activity but did not substantially exhibit RNase H activity. Kotewicz and Gerard faced several difficulties in developing this enzyme. First, it was unknown at the time where on the RT molecule the DNA polymerase and RNase H activities resided. Further, it was unknown whether the RNase H activity could be selectively removed to produce an improved mutant RT enzyme that retained DNA polymerase activity. The inventors spent several years unsuccessfully attempting to locate and delete the RNase H activity from the RT molecule.

The breakthrough for the inventors came in 1986 with the publication of M.S. Johnson et al., *Computer Analysis of Retroviral Pol Genes: Assignment of Enzymatic Functions to Specific Sequences and Homologies with Nonviral Enzymes*, 83 Proceedings of the Nat'l. Acad. of Sci. 7648 (1986) ("the Johnson article"). The Johnson article reported comparisons made between amino sequences of certain RT molecules and the sequence of the ribonuclease enzyme from E. coli, which exhibits RNase H activity but not DNA polymerase activity. The findings of Johnson suggested to the inventors that the RNase H activity of the RT enzyme resided at the carboxyl terminal end of the molecule. The inventors, however, were skeptical of Johnson's results because the literature existing at the time suggested that the location of the RNase H activity was at the front end of the RT molecule. Additionally, the Johnson article was suspect because it utilized computer comparisons of amino acid sequences, rather than experimental data. Such computer comparisons were fairly new in the art at the time. Thus, in order to "exclude the possibility" that Johnson was correct, Kotewicz and Gerard decided to conduct experiments at the carboxyl terminal end of the RT enzyme. Contrary to expectations, these experiments were successful and, by December 1986, the inventors had created a mutant RT enzyme that lacked RNase H activity but retained DNA polymerase activity.

A few months after confirming their discovery, Kotewicz and Gerard learned that another researcher, Dr. Stephen Goff, was working to develop an engineered RT en-

zyme. On April 15, 1987, Kotewicz spoke on the telephone with Goff, a researcher at Columbia University. During this conversation, Goff stated that he had developed "oligonucleotide insertion mutations that reduce RNase H in cloned [RT]." However, there is no indication in the record that Goff revealed any further details concerning his work to Kotewicz during this conversation. Additionally, during the summer of 1987, Gerard learned that Goff had presented his RT research at Stanford University. Although neither Gerard nor Kotewicz attended this presentation, they surmised, based on conversations with colleagues, that Goff demonstrated "similar results" as the inventors. Based on this information, Kotewicz and Gerard urged LTI to allow them to publish their results as quickly as possible, under the assumption that Goff would soon publish similar work. They also submitted forms to management at LTI that initiated the process for preparing a patent application for their engineered RT enzyme.

In January 1988, Kotewicz and Gerard filed the parent application from which the '797 and '005 patents ultimately issued. In general, the application claimed an engineered RT enzyme that exhibited DNA polymerase activity but did not exhibit substantial RNase H activity. As part of the duty of disclosure under 37 C.F.R. § 1.56, the inventors disclosed to the Patent and Trademark Office ("PTO") numerous prior art references, including the Johnson article. However, the inventors did not reveal their knowledge of Goff's work because their patent attorney indicated that such limited and incomplete information would not be material.

During the prosecution leading to the '797 patent, the Johnson article took on particular importance for the Examiner. Several times, the Examiner rejected the inventors' claims as obvious over Johnson, often in combination with other prior art that described the RT gene sequence. According to the Examiner, because Johnson taught that the RNase H activity was located at the carboxyl terminal end, and because there was a strong motivation in the art to eliminate such activity, the claimed invention would have been obvious. In response to these rejections, the inventors argued that, at the time of the invention, there would have been no reasonable expectation that the application of Johnson's results would successfully lead to the deletion of RNase H activity. This was because the teachings of Johnson were contrary to teachings in the prior art which suggested that "something more was necessary" than a deletion at the carboxyl terminal end to eliminate RNase H activity. Thus, the inventors contended that the claimed invention would not have been obvious over Johnson. The Examiner was persuaded by these arguments, and the '797 patent issued on September 19, 1993. At no time during this prosecution did the inventors reveal to the Examiner that the Johnson article played a key role in their development of the claimed invention.

Shortly after the issuance of the '797 patent, the inventors filed the continuation application that eventually resulted in the issuance of the '005 patent. During the prosecution of this application, the inventors revealed their knowledge of Goff's work. The Examiner allowed the application to issue over the newly revealed information regarding Goff, stating that the new information had "no bearing on ... the instant application."

In December 1996, LTI sued Clontech Laboratories, Inc. ("Clontech") for infringement of the '797 and '005 patents. In response, Clontech asserted various affirmative defenses, including an allegation that the patents should be held unenforceable due to inequitable conduct. A bench trial on the inequitable conduct issue ensued. After the trial, the court found that the inventors withheld material information regarding the motivations that they derived from the Johnson article and their reliance on it in reaching their invention. The court also found that the inventors made affirmative material misrepresentations during prosecution regarding the

Johnson article. Further, the court found that the inventors' knowledge of Goff's work was material and should have been revealed to the PTO during the prosecution of the '797 patent. Finally, the court determined that these actions were done with the intent to deceive the PTO. As a result, the court held that both the '797 and '005 patent were unenforceable on the ground of inequitable conduct. This appeal followed.

## DISCUSSION

■■ Applicants for patents, including their legal representatives, have the duty to prosecute patent applications in the PTO with candor, good faith, and honesty. *See Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178, 33 U.S.P.Q.2d 1823, 1826 (Fed. Cir.1995); 37 C.F.R. § 1.56 (1999). When this duty is breached, the applicant has committed inequitable conduct. A determination of inequitable conduct during the prosecution of a patent application renders the subsequently issued patent unenforceable. *See LaBounty Mfg., Inc. v. United States Int'l Trade Comm'n*, 958 F.2d 1066, 1070, 22 U.S.P.Q.2d 1025, 1028 (Fed.Cir. 1992).

■■ Inequitable conduct can consist of affirmative misrepresentations of material fact, submission of false material information, or the failure to disclose known material information during the prosecution of a patent, coupled with the intent to deceive the PTO. *See Molins*, 48 F.3d at 1178, 33 U.S.P.Q.2d at 1826. Materiality and intent to deceive are distinct factual inquiries, and each must be shown by clear and convincing evidence. *See Elk Corp. v. GAF Bldg. Materials Corp.* 168 F.3d 28, 30, 49 U.S.P.Q.2d 1853, 1855 (Fed.Cir. 1999); *Molins*, 48 F.3d at 1178, 33 U.S.P.Q.2d at 1826 ("Materiality does not presume intent, which is a separate and essential component of inequitable conduct." (quoting *Allen Organ Co. v. Kimball Int'l, Inc.*, 839 F.2d 1556, 1567, 5 U.S.P.Q.2d 1769, 1778 (Fed.Cir.1988))). Once these threshold levels of materiality and intent are satisfied, the ultimate determination of inequitable conduct is within the discretion of the trial court, which must make the equitable judgment concerning whether the applicant's conduct is so culpable that the patent should not be enforced. *See Kingsdown Med. Consultants, Ltd. v. Hollister, Inc.*, 863 F.2d 867, 876, 9 U.S.P.Q.2d 1384, 1392 (Fed.Cir. 1988) (en banc); *LaBounty*, 958 F.2d at 1070, 22 U.S.P.Q.2d at 1028. In making this determination, the court must conduct a balancing test between the levels of materiality and intent, with a greater showing of one factor allowing a lesser showing of the other. *See Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253, 1256, 43 U.S.P.Q.2d 1666, 1668 (Fed. Cir.1997).

■■ Because the determination of inequitable conduct is ultimately committed to the discretion of the district court, we review its determination for abuse of discretion. *See Kingsdown*, 863 F.2d at 876, 9 U.S.P.Q.2d at 1392. We must reverse a discretionary ruling of the district court when it is premised upon clearly erroneous findings of fact or on a misapplication or misinterpretation of applicable law, or evidences a serious error of judgment. *See id.* Thus, the district court's factual findings on the issues of materiality and intent are reviewed for clear error, and will not be reversed unless this court has a "definite and firm conviction that a mistake has been committed." *Elk Corp.*, 168 F.3d at 31, 49 U.S.P.Q.2d at 1855 (quoting *Molins*, 48 F.3d at 1178, 33 U.S.P.Q.2d at 1827).

The district court determined that the inventors committed inequitable conduct based on three actions during the prosecution of the '797 patent—withholding information regarding their "reliance" on the Johnson article, making material misrepresentations regarding the Johnson article, and withholding information regarding Goff's work. We will address each of these actions in turn.

1. Withholding Information Regarding the Johnson Article

■ As described above, the Johnson article was extremely influential in leading

the inventors to their engineered RT enzymes. Realizing its materiality to the patentability of the claimed invention, the inventors revealed the Johnson article to the PTO during prosecution and even discussed it in the written description section of the patent application. The district court, however, determined that merely disclosing the reference itself was insufficient to comply with the duty of candor. Relying heavily on the testimony of former PTO Commissioner Harry Manbeck, the court found that the inventors should have also disclosed their "reliance" on Johnson, and how it motivated them to conduct the experiments that eventually led to the invention. Thus, the district court determined that the manner in which the inventors used a disclosed prior art reference is material information and must be revealed to the PTO. Because this factual finding was premised upon a misapprehension of the legal standards of patentability, it is clearly erroneous.

Information is material when there is a substantial likelihood that a reasonable Examiner would have considered the information important in deciding whether to allow the application to issue as a patent. *See Molins,* 48 F.3d at 1179, 33 U.S.P.Q.2d at 1827. Because patentability is assessed from the perspective of the hypothetical person of ordinary skill in the art, information regarding the subjective motivations of inventors is not material. *See Standard Oil Co. v. American Cyanamid Co.,* 774 F.2d 448, 454, 227 U.S.P.Q. 293, 297 (Fed.Cir.1985) (noting that the person of ordinary skill in the art is an objective legal construct presumed to think along conventional lines without undertaking to innovate, whether by systematic research or by extraordinary insights). As stated by this court in *Standard Oil:*

> Inventors, as a class, according to the concepts underlying the Constitution and the statutes that have created the patent system, possess something—call it what you will—which sets them apart from the workers of ordinary skill, and one should not go about determining obviousness under § 103 by inquiring

into what patentees ... would have known or would likely have done, faced with the revelations of references.

*Id.* Furthermore, the path that leads an inventor to the invention is expressly made irrelevant to patentability by statute. *See* 35 U.S.C. § 103(a) ("Patentability shall not be negatived by the manner in which the invention was made."). Thus, the inventors' reliance on the Johnson article and the motivations that they derived from it have no bearing on the issue of patentability. It does not matter whether the inventors reached their invention after an exhaustive study of the prior art, or developed their RT enzymes in complete isolation. The only inquiry is whether the teachings of the Johnson article, in combination with other relevant prior art, would have rendered the claimed invention obvious to one of ordinary skill in the art; this inquiry, as a matter of law, is independent of the motivations that led the inventors to the claimed invention. Therefore, the district court clearly erred by finding that the inventors' reliance on Johnson was material.

### 2. Material Misrepresentations Regarding the Johnson Article

The district court also found that the inventors made affirmative misrepresentations regarding the Johnson article. During the prosecution of the '797 patent, the inventors were faced with rejections based on Johnson, which taught the location of the RNase H activity, in combination with other prior art references that described the RT enzyme itself. In response to these rejections, the inventors argued that this combination did not render the claimed invention obvious because at the time the invention was made, one of ordinary skill in the art would have thought that "something more was necessary" than a deletion at the carboxyl terminal end to eliminate RNase H activity. Thus, they argued, there would have been no reasonable expectation of success in applying Johnson's teachings. The court

determined that this was a misrepresentation because the inventors later admitted that the Johnson article correctly taught the location of RNase H activity and led them directly to the claimed invention. In effect, the court determined that inventors could not truthfully argue lack of reasonable expectation of success as a basis for non-obviousness when they successfully used the prior art reference at issue. The court clearly erred in this determination.

It is axiomatic that a claimed invention is not obvious solely because it is composed of elements that are all individually found in the prior art. *See, e.g., In re Rouffet,* 149 F.3d 1350, 1357, 47 U.S.P.Q.2d 1453, 1457 (Fed.Cir.1998). Thus, even though the location of the RNase H activity is taught in the Johnson article, the claimed invention of the '797 patent is not *per se* obvious. For the Johnson article to render the claimed invention obvious, there must have been, at the time the invention was made, a reasonable expectation of success in applying Johnson's teachings. *See Micro Chem., Inc. v. Great Plains Chem. Co.,* 103 F.3d 1538, 1547, 41 U.S.P.Q.2d 1238, 1245 (Fed.Cir.1997); *In re O'Farrell,* 853 F.2d 894, 903, 7 U.S.P.Q.2d 1673, 1681 (Fed.Cir.1988). Because the Johnson article was contrary to established teachings and was based on a relatively new technique, the inventors argued that a reasonable expectation of success was lacking. This argument is simply not a misrepresentation.

First, in making the argument, the inventors merely advocated a particular interpretation of the teachings of the Johnson article and the level of skill in the art, which the Examiner was free to accept or reject. This argument did not contain any factual assertions that could give rise to a finding of misrepresentation. *See, e.g., Akzo N.V. v. United States Int'l Trade Comm'n,* 808 F.2d 1471, 1482, 1 U.S.P.Q.2d 1241, 1247 (Fed.Cir.1986) (holding that an argument for distinguishing prior art, even though favorable to the applicant's position, was not a material misrepresentation because the Examiner could reach his/her

own conclusions regarding the prior art). Furthermore, the inventors' argument is not contradicted by the fact that they successfully used the Johnson article to achieve the desired result. Reasonable expectation of success is assessed from the perspective of the person of ordinary skill in the art. *See Micro Chem.,* 103 F.3d at 1547, 41 U.S.P.Q.2d at 1245. That the inventors were ultimately successful is irrelevant to whether one of ordinary skill in the art, at the time the invention was made, would have reasonably expected success. *See Standard Oil,* 774 F.2d at 454, 227 U.S.P.Q. at 297. The court's finding to the contrary represents impermissible use of hindsight—using the inventors' success as evidence that the success would have been expected. *See In re Kotzab,* 217 F.3d 1365, 1369, 55 U.S.P.Q.2d 1313, 1316 (Fed.Cir.2000) (noting the importance of casting the mind back to the time of the invention to avoid the "insidious effect of a hindsight syndrome wherein that which only the invention taught is used against its teacher"). In short, the inventors' non-obviousness arguments were not affirmative misrepresentations and cannot give rise to a determination of inequitable conduct. Thus, the district court committed clear error.

### 3. Withholding Knowledge of Goff's Work

Finally, the district court determined that the inventors had withheld material information regarding Goff's work. Specifically, the court found that the inventors should have revealed that Goff claimed to have developed "oligonucleotide insertion mutations that reduce[d] RNase H in cloned [RT]," and had presented these results at a conference during the summer of 1987. The court clearly erred in finding that this information was material.

As described above, information is material when there is a substantial likelihood that a reasonable Examiner would have considered the information important in

deciding whether to allow the application to issue as a patent. *See Molins*, 48 F.3d at 1179, 33 U.S.P.Q.2d at 1827. The inventors were in possession of only very limited information regarding Goff's work. At most, the inventors could have disclosed to the PTO that a rival researcher claimed to have reduced RNase H activity in cloned RT and had presented his results at a conference, which neither of the inventors attended. Clontech contends that this information was material because it indicated that Goff was a prior inventor. However, this information lacks the specificity and definiteness required to support a patentability rejection under 35 U.S.C. § 102(g).

 To establish prior inventorship, one must show either a prior reduction to practice of the invention or a prior conception followed by reasonable diligence in reducing the invention to practice. *See Eaton v. Evans*, 204 F.3d 1094, 1097, 53 U.S.P.Q.2d 1696, 1698 (Fed.Cir.2000). While the inventors knew that Goff had potentially achieved a reduction in RNase H activity in RT enzymes, the inventors were unaware of when these results were achieved, how they were achieved, the degree to which the RNase H activity was reduced, or whether DNA polymerase activity was retained. Knowledge of these details would have been required for the Examiner to consider whether Goff was a prior inventor. Because the inventors lacked such crucial information, the incomplete knowledge that they did have regarding Goff would not have been material to a reasonable Examiner. *See Hartness Int'l, Inc. v. Simplimatic Eng'g Co.*, 819 F.2d 1100, 1107, 2 U.S.P.Q.2d 1826, 1831 (Fed. Cir.1987) (holding that inequitable conduct had not been established when the patentee had only "heard of" a third-party usage). This conclusion is supported by the fact that when the substance of the Goff telephone conversation was revealed to the Examiner during the prosecution of the '005 patent, the Examiner stated that the information had "no bearing on the patents issued or the instant application." Such a strong statement regarding the Goff information is highly probative of its immateriality. *See Molins*, 48 F.3d at 1179, 33 U.S.P.Q.2d at 1827 ("[T]he result of a PTO proceeding that assesses patentability in light of information not originally disclosed can be of strong probative value in determining whether the undisclosed information was material.").

Moreover, the inventors did not obtain any material information regarding Goff's work based on his presentation at Stanford. The inventors neither attended this presentation, nor were provided with an abstract of the presentation. They had heard from colleagues that Goff presented results similar to theirs, but the record does not show that the inventors learned any additional details regarding Goff's work. Thus, the inventors could not have revealed anything to the Examiner regarding this presentation beyond conjecture and a vague report that "similar results" were presented. Such incomplete information would be singularly unhelpful to the Examiner in determining whether the invention was patentable, and consequently, would not be material.

## CONCLUSION

The district court clearly erred in finding that the inventors withheld material information and made affirmative misrepresentations during the prosecution of the patents at issue. Therefore, the court's determination that the inventors engaged in inequitable conduct is reversed, and this case is remanded for further proceedings.

## COSTS

Each party shall bear its own costs.

*REVERSED AND REMANDED.*